# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**F. THOMAS SCHORNHORST**
Oxford, Mississippi

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Dec 19 2013, 9:10 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| WILLIAM HINESLEY, III, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 55A05-1302-PC-80 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MORGAN SUPERIOR COURT
The Honorable Jane Spencer Craney, Judge
Cause No. 55D03-1205-PC-673

**December 19, 2013**

**OPINION – FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**[1]

Following a bench trial, William Hinesley, III, was convicted of class A felony child molesting. After this Court affirmed his conviction on direct appeal, Hinesley filed a petition for post-conviction relief claiming that he was denied the effective assistance of trial counsel due to his counsel's deliberate strategic choice to permit the trier of fact to consider as substantive evidence hearsay statements attributed to the State's primary witnesses. Hinesley also claimed ineffective assistance due to his counsel's failure to object to improper vouching and uncharged misconduct testimony, and his counsel's failure to introduce a medical report into evidence at trial. In addition, Hinesley raised a freestanding claim of fundamental error due to alleged prosecutorial misconduct based upon the prosecutor's knowing introduction of the alleged inadmissible hearsay, vouching, and uncharged misconduct evidence. The post-conviction court denied relief, and Hinesley now appeals. Concluding that the post-conviction court properly determined that Hinesley failed to demonstrate that his counsel's performance was deficient or prejudicial, and further concluding that his claim of prosecutorial misconduct is unavailable, we affirm.

**Facts and Procedural History**

On direct appeal, another panel of this Court recited the facts underlying Hinesley's conviction as follows:

> On the night of January 16, 2009, the Hinesley family was at home in Paragon, Indiana. Hinesley, his son William J. Hinesley, IV ("Billy"), who was twenty

---

[1] We held oral argument on November 19, 2013, in Indianapolis. We thank counsel for their preparation and presentations, and we commend them on their outstanding advocacy.

years old at the time, a foster daughter, V.V., who was thirteen years old at the time, and others were present. Eventually, Hinesley and V.V. were the only ones awake. They sat on a couch in the living room and talked as they watched a movie. Next, Hinesley got up and went into the kitchen. When he returned, he approached V.V. and pulled down her pants and underwear. Hinesley got on top of V.V. and put his penis in her vagina. After a short period of time, V.V. tried to push Hinesley away, and he got up and left the room. V.V. got up and pulled up her pants.

Meanwhile, Billy was going to the kitchen to get a glass of water. He encountered V.V., who told him that she had just had sex with Hinesley. Billy sent V.V. to the master bedroom while he woke his sister, S.H., and had her go into the master bedroom with him and V.V. In the morning, Billy contacted his uncle, who was a police officer in Mooresville, Indiana, and the local police were contacted.

*Hinesley v. State*, No. 55A04-1102-CR-90, slip op. at 1 (Ind. Ct. App. Oct. 27, 2011). The State charged Hinesley with two counts of class A felony child molesting and two counts of class C felony child molesting. Prior to trial, the State dismissed one of the class C felony counts.

A bench trial was held on December 1, 2010. The State's first witness was Detective Dan Downing of the Morgan County Sheriff's Department, the chief investigating officer in Hinesley's case. During his testimony, Detective Downing summarized unsworn statements that he had taken from V.V. and Billy during interviews on the morning of January 17, 2009. Detective Downing testified that Billy stated that he had left V.V. and Hinesley alone in the living room and later came down the hallway and observed V.V. jump off the couch and pull her pants up from around her ankle area. Trial Tr. at 17. Detective Downing testified that Billy stated that he spoke with V.V. and asked her if he had seen what he thought he saw and that V.V. had replied "yes." *Id*. at 18. Defense counsel did not object to Detective

3

Downing's testimony regarding Billy's statement. A video recording of Billy's interview was also entered into evidence without objection. In that recording, Billy stated, "I guess I asked her did he touch you in some spot. She said yes. And she told me that he had entered her." *Id*. at 21, State's Ex. 2.

Detective Downing then testified regarding V.V.'s interview. Detective Downing described V.V.'s demeanor as "[r]elatively childlike[,] she was very protected, very guarded. She acted much younger … than her physical age." *Id*. at 23. He opined, "she seemed very believable. I didn't see any reason not to believe her statements, especially due to the fact they were corroborated … by Billy." *Id*. Detective Downing testified that V.V. stated that she was resting her head in Hinesley's lap when Hinesley left to go into the kitchen to get something. Detective Downing testified that V.V. stated that, when Hinesley came back, he began rubbing her breast, buttock, and vaginal area. Detective Downing recalled,

> she then stated that he made penetration of her vaginal area. She couldn't tell me how long that went on or really give me any details about that. At that point in time she stated that Mr. Hinesley told her to pull her pants down, at which point in time he inserted … his penis into her vagina.

*Id*. at 25. When asked by the prosecutor, "What caused the intercourse to stop? Did she indicate?" Detective Downing responded, "She said … that they heard a noise and Mr. Hinesley got up off the top of her. At that point in time she seen Billy in the kitchen." *Id*. at 27.

Thereafter, V.V. was called as a witness by the State. She testified that she was resting her head on Hinesley's lap watching a movie when he got up to go to the kitchen. When he returned, he pulled her pajama bottoms and panties down to her ankles. V.V.

4

testified that Hinesley climbed on top of her and entered her vagina with his penis. She stated that she was stunned at first and started saying, "I want to go to bed." *Id*. at 117. V.V. stated that she pushed Hinesley off her. V.V. testified that she then saw Billy walking down the hall. Billy asked her if he "had seen what he just seen," and she replied, "yes." *Id*. at 118. V.V. testified that she used slang words to describe the intercourse to Billy by stating that Hinesley had put his "tweeter" into her "down there." *Id*. at 120. On cross-examination, V.V. admitted that, in a pretrial deposition, she said that she "forgot" or "wasn't sure" if Hinesley had penetrated her with his penis. *Id*. at 125, 143-45. V.V. testified that she was lying when she gave that deposition testimony.

Next, the State called Billy as a witness. Billy testified that V.V. told him that she had sex with his father but that "[a]t this point in time I do not remember what I saw." *Id*. at 170. The prosecutor reminded Billy about his statement to Detective Downing and asked Billy if he remembered telling Detective Downing that he actually saw V.V. pulling her pants up. Billy indicated that he remembered saying the words "I think I saw" to Detective Downing but claimed to now only recall what V.V. told him had happened and not what he saw. *Id*. at 174. Defense counsel cross-examined Billy by pointing out that Billy and V.V. were in a sexual relationship at the time of the incident and that Billy repeatedly lied about and denied the relationship during police interviews. Billy admitted that he was afraid of getting caught in his sexual relationship with V.V. because he knew that he could be charged criminally due to her age. Billy stated that he lied to Detective Downing about his relationship with V.V. and that he "could have" lied when he told Detective Downing that he actually saw anything

5

occur between his father and V.V. *Id.* at 178. Billy agreed that "there's a good chance that [he] didn't see anything at all." *Id.* Billy claimed on cross-examination that he learned after his initial interview with Detective Downing that V.V. was pregnant with his baby at the time of the alleged molestation.[2]

At the close of the State's case-in-chief, defense counsel moved for an involuntary dismissal of counts II and III, one class A felony child molesting count alleging deviate sexual conduct and the class C felony child molesting count alleging touching or fondling with intent to arouse, due to the lack of evidence presented by the State. The trial court granted the motion and dismissed counts II and III, and the trial proceeded as to count I, class A felony child molesting alleging sexual intercourse. At the conclusion of the trial, the court found Hinesley guilty of one count of class A felony child molesting. The trial court imposed a sentence of thirty years with five years suspended. This Court affirmed Hinesley's conviction on direct appeal. *See Hinesley*, slip op. at 3. On May 16, 2012, Hinesley filed a petition for post-conviction relief. The post-conviction court held an evidentiary hearing on October 25 and November 16, 2012. Thereafter, on February 12, 2013, the post-conviction court issued its findings of fact, conclusions of law, and judgment denying post-conviction relief. This appeal followed.

---

[2] The record indicates that, at the time of trial, V.V. had given birth to the baby and Billy was serving a work-release prison sentence in Johnson County for class C felony child molesting due to his relationship with V.V. Trial Tr. at 160-63, 183.

## Discussion and Decision

### *Standard of Review*

In *Wilkes v. State*, 984 N.E.2d 1236 (Ind. 2013), our supreme court reiterated the appellate standard of review regarding post-conviction proceedings. Specifically, the court stated,

> Post-conviction proceedings are civil proceedings in which the defendant must establish his claims by a preponderance of the evidence. Post-conviction proceedings do not offer a super appeal, rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Those grounds are limited to issues that were not known at the time of the original trial or that were not available on direct appeal. Issues available but not raised on direct appeal are waived, while issues litigated adversely to the defendant are *res judicata*. Claims of ineffective assistance of counsel and juror misconduct may be proper grounds for post-conviction proceedings.

> Because the defendant is appealing from the denial of post-conviction relief, he is appealing from a negative judgment and bears the burden of proof. Thus, the defendant must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision. In other words, the defendant must convince this Court that there is *no* way within the law that the court below could have reached the decision it did. We review the post-conviction court's factual findings for clear error, but do not defer to its conclusions of law.

*Id.* at 1240 (citations and quotation marks omitted). We will not reweigh the evidence or judge the credibility of witnesses, and will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Graham v. State*, 941 N.E.2d 1091, 1096 (Ind. Ct. App. 2011), *aff'd on reh'g*, 947 N.E.2d 962.

## I. Ineffective Assistance of Trial Counsel

Hinesley argues that the post-conviction court erred in finding that he was not denied the effective assistance of trial counsel. We review claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Bieghler v. State*, 690 N.E.2d 188, 192 (Ind. 1997), *cert. denied* (1998). To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citing *Strickland*, 466 U.S. at 687), *cert. denied* (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002). To establish prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. Isolated poor strategy, inexperience, or bad tactics does not necessarily constitute ineffective assistance. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *cert. denied* (1997). When considering a claim of ineffective assistance of counsel, we strongly presume "that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1073 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002).

We must initially acknowledge that the judge who presided over Hinesley's original trial is also the judge who presided over the post-conviction proceedings. This Court has stated that a post-conviction court's findings and judgment should be entitled to "greater than usual deference" when the post-conviction judge is the same judge who conducted the original trial. *See McCullough v. State*, 973 N.E.2d 62, 75 (Ind. Ct. App. 2012), *trans. denied* (2013). Significantly, in such a case, the judge is uniquely situated to assess whether trial counsel's performance fell below an objective standard of reasonableness and whether, but for counsel's unprofessional conduct, there was a reasonable probability that a different verdict would have been reached. *Id*. (citing *State v. Dye*, 784 N.E.2d 469, 476 (Ind. 2003) (noting that because judge presided both at original trial and post-conviction hearing, judge was in "an exceptional position" to assess weight and credibility of factual evidence and whether defendant was deprived of fair trial)). In addition, as we discuss below within the context of the judicial temperance presumption, we are presented here with a case in which the judge here not only presided both at the original trial and the post-conviction hearing, but was also the trier of fact in the bench trial. That being said, we turn to Hinesley's multiple claims of ineffectiveness.

### A. *Hearsay Evidence*

Hinesley first asserts that his trial counsel rendered ineffective assistance by deliberately failing to object to the State's introduction of inadmissible hearsay evidence. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule

801(c). Generally, an out-of-court statement offered to prove the truth of the matter asserted is not admissible unless it falls under a hearsay exception. *See* Ind. Evidence Rule 802. If a statement involves hearsay within hearsay, also known as multiple hearsay or double hearsay, to be admissible, each part of the combined statements must conform with an exception to the hearsay rule. *See* Ind. Evidence Rule 805.

Before Billy and V.V. were called as witnesses, and without objection, Detective Downing was permitted to summarize what both Billy and V.V. told him during interviews conducted the morning after the alleged molestation. Detective Downing was also permitted to testify regarding what V.V. had stated to Billy on the night in question, otherwise known as hearsay within hearsay (V.V. to Billy, and Billy to Detective Downing). A video recording of Billy's interview was subsequently admitted into evidence without objection.

At the post-conviction hearing, defense counsel testified that his deliberate decision to not object to Detective Downing's testimony and Billy's recorded interview, which each contained hearsay statements and at least one double hearsay statement, was necessary for his trial strategy. He stated that his defense theory was "that the police investigation was pathetic" and that V.V. "was lying … and told so many different stories that … that didn't add up." PCR Tr. at 31. He believed that Billy's and V.V.'s failure to disclose to Detective Downing the fact that they were in a sexual relationship at the time of the alleged molestation was evidence of their motive to fabricate their stories. Defense counsel testified,

> [T]he general tactical decision was made that Billy and V.V. were all over the place and giving so many different stories, that the more stories that were out there, the more different tales that they were telling, I believed that Judge

Craney would see that as (inaudible) and [not] find [Hinesley] guilty beyond a reasonable doubt.

*Id*. at 77.

Hinesley argues that this strategy was unreasonable and that counsel clearly failed to understand the distinction between hearsay evidence received as substantive evidence and non-hearsay evidence of prior inconsistent statements admissible for impeachment purposes. *See Gray v. State*, 982 N.E.2d 434, 437 (Ind. Ct. App. 2013) (noting that Ind. Evidence Rule 613 allows the use of a prior inconsistent statement to impeach a witness, and when used in this manner, the statement is not hearsay). He argues that there was no excuse for allowing the State to introduce inadmissible hearsay statements of a witness as substantive evidence before that witness testified, especially when the statements were admissible for impeachment purposes only. Hinesley argues that by allowing the hearsay to come in as substantive evidence rather than waiting for Billy and V.V. to testify and to impeach them with their prior inconsistent statements, "counsel [caused] irreparable damage to Hinesley's case." Appellant's Reply Br. at 6..

A defendant has the burden to demonstrate to the post-conviction court that his counsel's trial strategy was unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688. That the defense strategy was ultimately unsuccessful does not mean that counsel was constitutionally ineffective. *Wilkes*, 984 N.E.2d at 1245 (citing *Strickland*, 466 U.S. at 689). Indeed, just because counsel is unable to pursue a reasonable defensive strategy as effectively as he or she wanted to does not mean that the plan was a bad plan. *McCullough*, 973 N.E.2d at 76. "*Strickland* does not guarantee perfect representation, only a

11

reasonably competent attorney." *Woodson v. State*, 961 N.E.2d 1035, 1041-42 (Ind. Ct. App. 2012) (citation and quotation marks omitted), *trans. denied*. "There is no constitutional requirement that a defense attorney be a flawless strategist or tactician." *Id*. at 1042.

Regarding defense counsel's chosen strategy, the post-conviction court specifically found:

> 20. [Defense counsel] specifically and knowingly allowed the pre-trial statements of Billy and V.V. to be presented as substantive evidence, without making objections on any hearsay basis, based on his trial strategy of allowing what he believed to be multiple inconsistent statements to come into evidence;
>
> ….
>
> 34. During the PCR hearing, [defense counsel] testified that his theory of trial defense was that V.V. and the Defendant's son, Billy, had fabricated the claims against Hinesley for ulterior reasons and that by allowing all of their pre-trial statements into evidence, he could demonstrate the various inconsistencies in their statements;
>
> 35. [Defense counsel] knowingly allowed hearsay evidence into the record as substantive evidence due to his trial strategy.

PCR App. at 147. Thereafter, the post-conviction court concluded that defense counsel's "failure to object to hearsay evidence from the various witnesses during the trial was a trial strategy and was reasonable under the unique circumstances of this case." *Id*. at 151.

The State relies on our opinion in *Curtis v. State*, 905 N.E.2d 410 (Ind. Ct. App. 2009), *trans. denied*, to support the post-conviction court's conclusion that permitting the hearsay to be introduced constituted reasonable trial strategy. In *Curtis*, defense counsel stipulated to the admission of various pretrial hearsay statements made by children regarding alleged sexual abuse according to the strategy that "the inconsistencies among the statements

12

might work to [the defendant's] advantage." *Id*. at 415. Indeed, counsel in *Curtis* knew "the [hearsay] evidence would be introduced in one form or another" so he made the deliberate strategic choice to try to use the evidence to the defendant's advantage. *Id*. On appeal from the denial of post-conviction relief, we concluded that the post-conviction court properly refused to second-guess counsel's strategy. *Id*. We specifically noted that, while the defendant claimed that his convictions on four counts of child molesting and three counts of battery demonstrated the failure of his counsel's strategy, the defendant was acquitted on two counts of vicarious sexual gratification. Accordingly, we concluded that although the record was unclear, "the strategy employed by [defense] counsel may have been a factor in those acquittals." *Id*.

While *Curtis* is not precisely on point factually, its reasoning regarding the deliberate trial strategy chosen by defense counsel here is instructive. Hinesley concedes that the hearsay evidence was admissible for impeachment purposes, and therefore the evidence was going to be admitted in one form or another. As defense counsel explained during the post-conviction hearing, he hoped that allowing all of the statements into evidence and demonstrating the inconsistencies among the multiple statements would work to Hinesley's advantage to show V.V.'s and Billy's motive to fabricate and to create reasonable doubt. While counsel's manner of execution may not have been perfect or even preferred, it appears that his performance was consistently aimed at executing this chosen defense strategy. To the extent that Hinesley claims that his conviction demonstrates the failure of his counsel's strategy, we note that the trial court dismissed two child molesting counts at the close of the

13

State's case-in-chief due to lack of evidence. As in *Curtis*, although the record is unclear, the strategy employed by counsel may have been a factor in those dismissals. We cannot say that the post-conviction court erred when it concluded that defense counsel's trial strategy was reasonable under the unique circumstances of this case.

### B. Vouching Testimony

Hinesley next claims that he was denied the effective assistance of counsel due to his counsel's failure to object and/or move to redact two instances of improper vouching testimony. Regarding V.V., Detective Downing testified: "But she seemed very believable. I didn't see any reason not to believe her statements, especially due to the fact they were corroborated [by] Billy." Tr. at 23. Similarly, in his recorded statement which was admitted into evidence, Billy stated to Detective Downing that "I don't believe V.V. made this up." *Id*. at 21, State's Ex. 2.

Vouching testimony is generally prohibited under Indiana Evidence Rule 704(b), which states: "Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." Such testimony invades the province of the jury because it is essential that the trier of fact determine the credibility of the witnesses and the weight of the evidence. *Gutierrez v. State*, 961 N.E.2d 1030, 1034 (Ind. Ct. App. 2012).

The State maintains that, even assuming that these two statements did constitute improper vouching testimony to which a proper objection would have been sustained,

counsel's failure to object to the statements was again consistent with his trial strategy.[3]

During the post-conviction proceedings, defense counsel testified that although he did not specifically recall his justification for not objecting to Detective Downing's alleged vouching testimony, he believed that his decision may have been premised on his general trial strategy of trying to expose the "totality of Detective Downing's pathetic investigation" and how Detective Downing seemed to just accept V.V. and Billy's account of things but "did not know many of the facts" that he needed to know. PCR Tr. at 49. As for Billy's alleged vouching statement, counsel stated that he did not object because he knew that Billy's forthcoming trial testimony was going to be "quite to the contrary," and thus this was again supportive of his general strategy of pointing out the numerous variations in V.V.'s and Billy's stories. *Id*. at 50.

While trial counsel could not specifically explain his reasons for failing to object, we observe that courts should not insist that attorneys "'confirm every aspect of the strategic basis for his or her actions.'" *Woodson*, 961 N.E.2d 1041 (quoting *Harrington v. Richter*, ___ U.S.___, 131 S. Ct. 770, 790 (2011)). In light of defense counsel's overall trial strategy, counsel's failure to object to the two alleged vouching statements did not constitute deficient

---

[3] While we need not reach a conclusion as to whether a proper objection to the alleged vouching statements would have been sustained, we note that Hinesley's trial occurred in 2010, prior to our supreme court's opinion in *Hoglund v. State*, 962 N.E.2d 1230 (Ind. 2012). Before *Hoglund*, courts allowed "some accrediting of the child witness in the form of opinions from parents, teachers, and others having adequate experience with the child, that the child is not prone to exaggerate or fantasize about sexual matters." *Lawrence v. State*, 464 N.E.2d 923, 925 (Ind. 1984). Applying the *Lawrence* rule, however, was not simple, as "'the line between the impermissible vouching for the victim's credibility on the one hand and rendering permissible opinions with regard to a proclivity to not exaggerate or fantasize, on the other hand, is an extremely fine one.'" *Hoglund*, 962 N.E.2d at 1233 (quoting *Hook v. State*, 705 N.E.2d 219, 223 n.4 (Ind. Ct. App. 1999), *trans. denied*). *Hoglund* eliminated this "vouching testimony exception in the context of child-molesting cases." *Palilonis v. State*, 970 N.E.2d 713, 729 (Ind. Ct. App. 2012), *trans. denied*.

performance and was not unreasonable under the circumstances. Moreover, the concern with improper vouching testimony is that the jury may be influenced in a manner inconsistent with the defendant's right to a fair trial. This particular concern is not present here because, as we discuss more fully below, this was a bench trial. Finally, the record reveals that the two statements were isolated and not pervasive and did not affect the outcome of the trial. We are unpersuaded that but for counsel's failure to object to the alleged improper vouching statements, there is a reasonable probability that the verdict would have been different.

### C. Uncharged Misconduct

Hinesley makes a brief argument regarding defense counsel's failure to move to redact from Billy's recorded statement some "irrelevant" references as well as Billy's reference to a conversation with his sister, S.H., in which he stated that S.H. complained to him about unwanted physical attention from Hinesley. Hinesley asserts that Billy's reference to his conversation with S.H. "implies" uncharged misconduct in violation of Indiana Evidence Rule 404(b). Appellant's Br. at 26. Evidence which creates a mere inference of prior misconduct is not prohibited by Evidence Rule 404(b). *Dixson v. State*, 865 N.E.2d 704, 712 (Ind. Ct. App. 2007), *trans. denied*. Additionally, when looking at the evidence presented as a whole, we observe that the reference was inconsequential, and Hinesley has failed to show that he suffered prejudice as a result.

### D. Medical Report

Hinesley next asserts that his counsel was ineffective for failing to obtain and introduce the medical report from a physical examination of V.V. conducted the day after the

molestation, which indicated that V.V. did not suffer injury to her vagina and that her hymen remained intact. Hinesley concedes that although introduction of the report would not have negated the molestation allegation, the report would have "strengthened" his case. Appellant's Br. at 31. Hinesley argues that "it would have been helpful to his defense to show that not only had [V.V.'s] hymen survived her claimed penetration" but there was no sign of any "abrupt" or "forcible" penetration. Appellant's Reply Br. at 14.

During post-conviction proceedings, defense counsel stated that he could not recall if the medical report was in his file and could not explain his failure to both seek and introduce the report. Regardless, we cannot say that the medical report has the same exculpatory value that Hinesley now assigns it such that the result of the trial would have been different had counsel introduced it. Part of the defense theory revolved around Billy and V.V.'s hidden sexual relationship and V.V.'s pregnancy with Billy's baby at the time of the alleged molestation. In light of the fact that V.V. was both sexually active and pregnant at the time of the alleged molestation, a report stating that V.V.'s hymen was still intact becomes far less significant, as the report neither supports nor negates sexual contact with Hinesley, and could tend to undermine the extent of the sexual relationship between V.V. and Billy.

While Hinesley belabors the importance of the lack of evidence of physical trauma to V.V.'s vagina reported by the examiner, we observe that V.V.'s trial testimony did not recount a violent or abrupt sexual encounter. Moreover, the parties had already stipulated that DNA tests, conducted at the same time as the physical examination, showed no evidence of sexual contact between Hinesley and V.V. Tr. at 7. We agree with the State that the DNA

17

evidence is by far the more compelling exculpatory evidence and is also evidence not inconsistent with the defense strategy. We cannot say that failure to introduce the medical report constituted ineffective assistance of counsel. *See*, *e.g.*, *Kubsch v. State*, 934 N.E.2d 1138, 1142 (Ind. 2010) (refusing to find ineffective assistance in failing to introduce allegedly exculpatory evidence when that evidence did not support the defense theory and it was impossible to conclude that the evidence had exculpatory value). Significantly, Hinesley submitted the medical report at the post-conviction hearing, and the court determined that even had counsel introduced the report at trial, the outcome would not have changed. Hinesley has not met his burden on this issue.

### E. Cumulative Impact & Judicial Temperance

Hinesley maintains that the record reveals that, due to defense counsel's unreasonable trial strategy and multiple errors, his conviction was improperly based on evidence that should have been excluded or, at the very least, disregarded. He contends that it was the cumulative impact of his counsel's poor decisions that rendered the representation ineffective and caused him prejudice.[4] A court making the prejudice inquiry must ask if the defendant has met his burden of showing that the decision reached would reasonably likely have been

---

[4] We note that, in his appellant's brief, Hinesley alleges numerous other isolated deficiencies in counsel's performance that we conclude do not amount to ineffective assistance but choose not to specifically address herein. (For example, he concedes that counsel effectively cross-examined V.V. in some respects, but argues that counsel could have done better.) *See Martin v. State*, 760 N.E.2d 597, 601 n.3 (Ind. 2002). As our supreme court has stated, "[a] multitude of marginal issues may hide those with merit. To quote Justice Jackson: 'Legal contentions, like currency, depreciate through over-issue.'" *Id.* (quoting Justice Robert H. Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L.Q. 115, 119 (1951)).

different absent the errors. *Potter v. State,* 684 N.E.2d 1127, 1135 (Ind. 1997) (citing *Strickland*, 466 U.S. at 696). Hinesley cannot demonstrate that he suffered such prejudice.

In considering whether Hinesley suffered prejudice, we look here to the application of the judicial-temperance presumption. Hinesley's trial was a bench trial and not a jury trial. We generally presume that in a proceeding tried to the bench, a court renders its decisions solely on the basis of relevant and probative evidence. *Konopasek v. State*, 946 N.E.2d 23, 28 (Ind. 2011). This longstanding principle has been termed the judicial-temperance presumption. *Id.* We presume that the trial judge is aware of and knows the law and considers only evidence properly before him or her in reaching a decision. *Conley v. State*, 972 N.E.2d 864, 873 (Ind. 2012). The risk of prejudice is quelled when the evidence is solely before the trial court. *Id.*[5]

Although the post-conviction court acknowledged that defense counsel allowed hearsay evidence to be presented by the State as substantive evidence without objection, the post-conviction court did not indicate that, as the trial judge, she relied on that evidence. To the contrary, Judge Craney specifically concluded that, "regardless of any hearsay admitted without objection," she "found V.V. to be a credible witness and believed her testimony." Appellant's App. at 163. Judge Craney's conclusion that she did not rely on inadmissible

---

[5] Our supreme court has noted that the judicial-temperance presumption, although broad, is not without limits. *Konopasek*, 946 N.E.2d at 28. In cases where a defendant has made a specific objection to evidence that is overruled, it becomes "a curious ratiocinative process which presumes that the trial court will disregard that which it holds admissible over specific objection." *Id.* (citing *Fletcher v. State*, 264 Ind. 132, 137, 340 N.E.2d 771, 774-75 (1976)). Therefore, one way that a defendant can overcome the presumption is by showing that the trial court admitted evidence over a specific objection. *Id.* at 29.

19

evidence is further supported by the fact that she dismissed two of the child molesting counts, specifically count II regarding deviate sexual conduct and count III, touching or fondling with intent to arouse, as the only evidence of those counts came in through Detective Downing's testimony as opposed to V.V.'s direct testimony. Regarding Judge Craney's alleged reliance on vouching or uncharged misconduct evidence due to defense counsel's trial strategy, while she did not affirmatively state in her findings that she did not improperly rely on that evidence in reaching her verdict, Hinesley has given us no cause to presume that she did not. Under the circumstances, Hinesley has failed to rebut the judicial-temperance presumption.

In sum, Hinesley has failed to demonstrate a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. As stated earlier, Judge Craney was not only the trier of fact and the trial judge, but she was also the post-conviction judge. We cannot imagine a post-conviction jurist in a better position to assess Hinesley's current claims of ineffective assistance of counsel. Judge Craney has made such an assessment, and her findings and judgment are entitled to greater than usual deference by this Court. *See McCullough*, 973 N.E.2d at 75. Hinesley has not met his burden to show that the evidence, as a whole, unmistakably and unerringly points to a contrary conclusion. Based upon the foregoing, we conclude that the post-conviction court did not err when it concluded that Hinesley was not denied the effective assistance of trial counsel.

## II. Prosecutorial Misconduct

Finally, in addition to claiming that his counsel was ineffective for failing to object to the introduction of alleged inadmissible evidence, Hinesley asserts that the prosecutor committed misconduct by knowingly introducing and/or eliciting that evidence. Because this issue was known and available on direct appeal but not raised, Hinesley's claim is not available as a freestanding claim of fundamental error on petition for post-conviction relief. Freestanding claims of fundamental error are not available in post-conviction proceedings. *Sanders v. State*, 765 N.E.2d 591, 591 (Ind. 2002); *Graham v. State*, 941 N.E.2d 1091, 1097 (Ind. Ct. App. 2011) *aff'd on reh'g,* 947 N.E.2d. 962.[6] The judgment of the post-conviction court is affirmed.

Affirmed.

BARNES, J., and PYLE, J., concur.

---

[6] Hinesley concedes that freestanding claims of fundamental error are unavailable on post-conviction relief, but invites us to address the following question: When a post-conviction petitioner was represented by the same lawyer on direct appeal as at trial, and where that lawyer could not assert his own ineffectiveness at trial or assert fundamental error because of counsel's failure to object to prosecutorial misconduct, may a post-conviction petitioner raise prosecutorial misconduct as a freestanding issue? Hinesley urges us to recognize a limited exception to our supreme court's established holding that freestanding fundamental error claims are not available to a post-conviction petitioner. He directs us to our supreme court's opinion in *Askew v. State*, 500 N.E.2d 1219 (Ind. 1986), in which the court acknowledged that because the same counsel represented the appellant at trial and on appeal, it is unreasonable to believe that counsel would have raised the question of his own competency on appeal. *Id*. at 1220. Hinesley argues that the precedent precluding arguing fundamental error in post-conviction proceedings is premised upon the assumption that the petitioner had one fair opportunity to raise an issue on direct appeal and that, because Hinesley's trial and appellate counsel were the same, Hinesley did not have that opportunity regarding prosecutorial misconduct because it was intertwined with ineffectiveness of counsel. While Hinesley points out an interesting quandary, absent specific direction from our supreme court, we decline his invitation to recognize an exception to the established precedent.

21

.