## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 02 2018, 9:32 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Victoria Christ
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ricky J. Thurston,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent.* | August 2, 2018<br><br>Court of Appeals Case No.<br>49A02-1710-PC-2279<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Kurt Eisgruber, Judge<br><br>The Honorable Steven Rubick, Magistrate<br><br>Trial Court Cause No.<br>49G01-1103-PC-14461 |

**Robb, Judge.**

# Case Summary and Issue

[1] Ricky Thurston appeals the post-conviction court's denial of his petition for post-conviction relief, raising one issue for our review: whether he was denied the effective assistance of counsel. Concluding that the post-conviction court's denial of Thurston's petition for post-conviction relief was proper, we affirm.

# Facts and Procedural History

[2] Following a jury trial, Thurston was convicted of rape and criminal confinement. The trial court subsequently found that he was an habitual offender. Thurston's convictions were affirmed by this court. *Thurston v. State*, No. 49A02-1204-CR-289 (Ind. Ct. App. Jan. 25, 2013), *trans. denied*. The facts of the offenses were determined on direct appeal as follows:

> On the evening of October 19, 2006, T.K. became involved in a heated argument with her husband and her daughter. When T.K. realized she was out of cigarettes, she asked her husband for the car keys so that she could drive to a nearby service station and buy more. T.K.'s husband refused to give her the keys because T.K. had been drinking, and T.K. left the house and began walking to the service station. T.K.'s husband followed her out of the house and for some distance, trying to convince her to return. T.K. continued walking, and her husband returned to the house. T.K. walked approximately four blocks to the service station and purchased cigarettes.
>
> As T.K. was walking back home, she saw a silver car drive past her, stop, turn around, and then drive back to her. The driver and sole occupant of the vehicle asked her if she wanted a ride. T.K. responded affirmatively and got into the car. The man said

his name was Troy, that he was twenty-six years old, and that he worked in construction. T.K. and the man drove around and talked for a while, smoking and drinking from a half-pint bottle of whiskey T.K. had taken from her home. When they ran out of whiskey, the man drove to a nearby house, which he told T.K. belonged to his employer, to get some beer. T.K. waited in the car while the man entered the house and emerged with a six-pack of beer. He then drove T.K. to a park and stopped the vehicle, where they continued to smoke, drink, and talk.

At some point, T.K. became tired and wanted to go home. When T.K. turned to ask the man to take her home, she saw that he had pulled his penis out of his pants and was masturbating. T.K. immediately demanded to be taken home, and the man stated that he wanted to have sex. T.K. said no and again asked to be taken home. The man then reached across T.K. and pulled a semiautomatic handgun out of the glove compartment. The man pressed the muzzle of the gun to the side of T.K.'s head and forced her to remove her clothes. T.K., who was experiencing symptoms of premature menopause including heavy menstrual bleeding, told the man that she was having menstrual problems in hopes that it would discourage him from continuing. In response, the man ordered T.K. to remove her tampon and throw it out of the vehicle. T.K. complied, and then climbed on top of the man and submitted to vaginal intercourse while he continued to hold the gun to her head.

When he finished, the man put the gun back into the glove compartment and got out of the vehicle to urinate. When the man walked out of T.K.'s line of sight, she ran from the vehicle and climbed a fence into the backyard of a nearby house, where she hid behind a picnic table. T.K. watched as the man returned to the vehicle and called her name, and then drove away. T.K. then went to the house and knocked on the door. When the homeowner answered the door, T.K. asked her to call 911

because she had been raped.  Police responded and an ambulance took T.K. to the hospital.

*Id*. at *2-4.

[3] T.K. sustained scratches on her hands and bruising on her right lower extremity, her left wrist, and on her inner thigh on both sides.  These injuries were consistent with climbing over a fence.  No traces of seminal material were found on T.K.'s body or clothing.

[4] T.K.'s case was dormant for approximately four years until DNA analysis was performed on cigarette butts recovered from the crime scene.  One DNA profile found as a result of that analysis matched an existing DNA profile of an unknown male from an open rape case in Marion County, case IP06051889 ("case -889").  The DNA results from the cigarette butts were uploaded to a statewide database and were found to match Thurston's DNA.  These results were confirmed by obtaining a DNA sample from Thurston, who was in custody by that time on an unrelated matter.

[5] On March 2, 2011, the State charged Thurston with rape, a Class A felony, and criminal confinement, a Class B felony.  Thurston's jury trial took place on February 13 and 14, 2012.  The trial court granted Thurston's motion in limine precluding the State and its witnesses from referencing Thurston's previous convictions, pending charges under investigation, or any non-*Ashton* criminal offenses not yet reduced to conviction.  Appellant's Trial Appendix, Volume I

at 56.  The trial court's preliminary instructions included the following in relevant part:

> INSTRUCTION NUMBER 1
>
> * * *
>
> You should focus your attention on the court proceedings and the evidence, and reach a verdict based upon what you hear and see in this court.
>
> INSTRUCTION NUMBER 14
>
> * * *
>
> A defendant must not be convicted on suspicion or speculation.
>
> * * *
>
> INSTRUCTION NUMBER 17
>
> . . . You must put your questions in writing.  I will review them with the attorneys, and I will determine whether your questions are permitted by law.  If a question is permitted, I will ask it of the witness.  If it is not permitted, you may not speculate as to why it was not asked, or what the answer may have been.

*Id*. at 62, 77, 80.

[6]     Shelly Crispin, a serologist and DNA analyst with the Indianapolis Marion County Forensic Services Agency ("IMCFSA"), testified for the State regarding

the DNA testing done in this case. During Crispin's testimony, the trial court admitted State's Exhibit 16, which was a report detailing the results of the DNA testing done on the cigarette butts, one of which was labeled "Item 003.001." The report provided the following conclusion regarding that Item:

> The DNA profile from item(s) 003.001 is a mixture with major and minor DNA contributors. The source of the partial major contributor of DNA is an unknown male. The partial DNA profile of the minor contributor is inconclusive.

> The partial DNA profile form the major contributor of item(s) 003.001 was entered into the IMCFSA DNA Database and was found to be consistent with an unknown partial male profile from the sperm fraction of item(s) 3.5.1 from [case -889]. The partial DNA profile from the major contributor of item(s) 003.001 was entered into the Indiana DNA Database and is being maintained on file for future searches.

Exhibit 16, Trial Exhibits, Confidential Volume at 249. Thurston's defense counsel did not object to the admission of Exhibit 16, and the exhibit was published to the jury. Crispin did not reference case -889 in her testimony.

[7] After Thurston's counsel cross-examined Crispin, the jury submitted questions to Crispin, two of which directly concerned the reference in Exhibit 16 to case -889. The jury inquired, "What is [case -889]?" and

> Is it fair to say that since the DNA from item 003.001 matched Ricky Thurston's profile, the partial male profile from the sperm fraction of item(s) 3.5.1 from [case -889] (referenced in paragraph 2 of conclusions [in] state's exhibit 16) is also that of Ricky Thurston?

Exhibits B, C, Post-conviction Relief Exhibits, Volume I.[1]  A juror also asked, "How does a person get into the State database?"  Exhibit B, PCR Exs., Vol. I. It was upon receipt of these jury questions that defense counsel first became aware of the reference to case -889 contained in Exhibit 16.  Defense counsel argued to the trial court that the above-referenced questions should not be asked because any reference to the DNA profile in case -889 was irrelevant since it was uncontested that Thurston's DNA matched the DNA profile found in this case.  The trial court did not ask Crispin the jury's questions regarding case -889 or the question pertaining to the database, and it disallowed another question relating to T.K.'s clothing.  Defense counsel did not seek any admonishment to the jury regarding the questions relating to case -889.

[8]  Detective Richard Burkhardt testified after Crispin.  Thurston's videotaped statement taken in 2011 was admitted into evidence during Burkhardt's testimony.  Thurston denied ever having been at the park, and he denied recognizing T.K. when shown a photograph of her taken shortly after the offenses.  At the close of Burkhardt's direct testimony, a conversation took place outside the presence of the jury regarding which exhibits would be sent with the jury into deliberations.  Defense counsel argued that the jury should not have Exhibit 16 during deliberations because it contained the reference to case -889.  The State argued that the exhibit had already been admitted into evidence without objection and that it was relevant to explain the DNA results

---

[1] The individual post-conviction relief hearing exhibits are not paginated.

in this matter. The trial court ruled that the jury could have reached a number of conclusions regarding the reference to case -889 contained in Exhibit 16 and that the reference was not so overwhelmingly explicitly related to the other pending rape case that it necessitated the exclusion of the exhibit from deliberations. Defense counsel moved for a mistrial based upon his own ineffectiveness in failing to notice and address the reference to case -889 in Exhibit 16. The trial court denied the motion.

[9] Prior to deliberations, the trial court reissued its preliminary instructions, including Instructions 1, 14, and 17. The trial court's Final Instruction Number 27 provided that "Your verdict should be based on the law and the facts as you find them. It should not be based on sympathy or bias." Appellant's Trial App., Vol. I at 90. During deliberations, the jury asked the trial court the following question:

> We feel that the jury instructions under 6 and 14 give
> contradictory instructions in this case. This perceived
> contradiction is leading to an impasse in our deliberation. Do
> you have any advice in how to overcome the impasse?

Trial Transcript, Volume II at 443. Instruction Number 6 pertained to the presumption of innocence and the fact that Thurston was not required to present any evidence to prove or explain anything. Appellant's Trial App., Vol. I at 69. Instruction Number 14 pertained to the State's burden of proof and provided clarification regarding reasonable doubt. *Id*. at 77. The trial court replied to the question by informing the jury that the instructions were pattern

instructions that should be reread along with all the instructions and that the jury should seek a verdict based upon its collective memory of the evidence. The jury found Thurston guilty of rape and criminal confinement, and the trial court subsequently found that Thurston was an habitual offender.

[10]     After his convictions were affirmed on direct appeal, Thurston sought post-conviction relief alleging that his trial counsel had been ineffective for failing to note the reference to case -889 in Exhibit 16, failing to prevent its admission into evidence at trial, and for failing to mitigate the damage caused by its admission.  In an affidavit admitted into evidence at the hearing on Thurston's petition for post-conviction relief, defense counsel averred that it was not a tactical decision on his part to allow the jury to see the reference to case -889, nor to forego an objection to Exhibit 16, nor to forego an admonishment to the jury regarding the reference to case-889.  Exhibit D, PCR Exs., Vol. I.  The post-conviction court denied Thurston's petition for post-conviction relief, concluding that Thurston had not been prejudiced by his counsel's performance because the reference to case -889 was isolated and because evidence corroborated T.K.'s version of events.  Appendix to Brief of Petitioner-Appellant, Volume Two at 131-32.  The post-conviction court found that "[b]eyond mere speculation, there is no basis to find that the single isolated reference to the case number affected the jury's deliberations in any way." *Id*. at 132.  This appeal ensued.

# Discussion and Decision

# I. Standard of Review

A petitioner seeking post-conviction relief has the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5). An appeal following the denial of post-conviction relief is an appeal from a negative judgment, which may be reversed only if "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Collins v. State*, 14 N.E.3d 80, 83 (Ind. Ct. App. 2014). "We defer to the post-conviction court's factual findings, unless they are clearly erroneous." *Id*.

# II. Ineffective Assistance of Counsel

It is well-established that the right to counsel provided in the Sixth Amendment guarantees the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to establish a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient such that it fell below an objective standard of reasonableness based on prevailing professional norms, and (2) that the defendant was prejudiced by his counsel's deficient performance. *Id*. at 687.

Both prongs of the *Strickland* test need not be addressed if a defendant has not met his burden of proof as to one prong. *See id*. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."). A defendant is sufficiently prejudiced if, but for his counsel's errors, there is a reasonable probability that the result of the

proceeding would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

[14] Here, we conclude that we need not address the quality of the representation provided by Thurston's trial counsel because we cannot conclude that the evidence is unerringly and unmistakably contrary to the post-conviction court's conclusion that Thurston was not prejudiced by his counsel's alleged errors. Thurston argues that his credibility before the jury was irreparably harmed by the reference to case -889 in Exhibit 16 because the jury "was unlikely to believe his consent argument after they learned he was a suspect in another case where his DNA matched a 'sperm fraction[.]'" Brief of Petitioner-Appellant at 30. The single reference at issue here is to "an unknown partial male profile from the sperm fraction of item(s) 3.5.1 from [case -889]." Trial Exs., Confidential Vol. at 249.

[15] We acknowledge that a reference to a sperm fraction has the potential to be more problematic in a rape case than it might in a case where another type of offense, such as a property or financial crime, is alleged. However, in this case, the nature of a "sperm fraction" or how Thurston's sperm fraction may have been obtained by the State was not elaborated upon or explained to the jury. There was no evidence before the jury as to the nature of case -889 or Thurston's role in that case, let alone that he was a suspect. As such, while the reference to case -889 may have permitted an inference of prior misconduct, it was too vague as to the nature of any prior criminal activity to support the forbidden inference that Thurston must have raped T.K. because he had been

accused of raping another. *See Hinesley v. State*, 999 N.E.2d 975, 986 (Ind. Ct. App. 2013) (noting the difference between evidence which creates a mere inference of prior misconduct and evidence that is prohibited by Indiana Evidence Rule 404(b)), *trans. denied*.

[16] The quality and quantity of the reference at issue here is what distinguishes this case from *Thompson v. State*, 15 N.E.3d 1097 (Ind. Ct. App. 2014), cited by Thurston in support of his claim of prejudice. *See* Br. of Petitioner-Appellant at 26-27. In *Thompson*, the investigating detective testified that he linked Thompson to the victim's rape because Thompson was also a suspect in another sexual assault, and the detective testified at length about the similarities in the two cases. *Thompson*, 15 N.E.3d at 1101. Such direct and detailed evidence regarding another sexual assault case in which the defendant had been identified as a suspect is a far cry from the isolated and ambiguous reference at issue here.

[17] Thurston's claim of prejudice is also undermined by the trial court's instructions to the jury. The trial court's preliminary instructions provided that the jury must base its verdict on the evidence it received during trial and that it could not convict Thurston based upon speculation. Although the jury asked questions about the reference to case -889 contained in Exhibit 16, the trial court did not pose those questions to Crispin, and the jury had been instructed that it was not to speculate why any of its questions had gone unasked or what the answers to its questions might have been. The jury was reminded of these directives as part of the trial court's final instructions, and the trial court further

instructed the jury to base its verdict on the facts and the law, not on sympathy or bias. A jury is presumed to follow a trial court's instructions. *Carpenter v. State*, 15 N.E.3d 1075, 1078 (Ind. Ct. App. 2014), *trans. denied*. Thurston's speculation as to what the jury could have concluded from the reference to case -889 and his attempts to draw conclusions from the jury's impasse question, *see* Br. of Petitioner-Appellant at 23-26, do not overcome the presumption that the jury followed the trial court's instructions to base its verdict only on the evidence presented at trial and not upon speculation about its unanswered questions.

[18] Thurston contends that the reference to case -889 must have prejudiced him sufficiently to undermine confidence in the outcome of his trial because this case rested purely upon the jury's credibility assessments of him and T.K. *See* Br. of Petitioner-Appellant at 24. We disagree. T.K.'s version of events was not entirely without corroboration. T.K. sustained documented injuries climbing over a fence fleeing from Thurston, which was inconsistent with Thurston's theory of the case that T.K. consented to having sex with him. In addition, the jury heard Thurston's initial claim to investigators that he had never been to the park where his DNA was recovered, and it heard his initial claim not to recognize T.K., a woman with whom his counsel argued Thurston had consensual sex. Although this evidence is not overwhelming, neither was the reference at issue here. Given the vagueness of the isolated reference at issue, the trial court's instructions to the jury, and the other evidence presented at trial, our confidence in the jury's verdict is not undermined. The post-

conviction court's conclusion that Thurston was not prejudiced by his counsel's performance was not clearly erroneous. *Collins*, 14 N.E.3d at 83.

# Conclusion

Concluding that Thurston was not denied the effective assistance of counsel and that the post-conviction court's denial of relief was proper, we affirm.

Affirmed.

Najam, J., and Altice, J., concur.