In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2122

WILLIAM HINESLEY, III,

*Petitioner-Appellant*,

*v.*

WENDY KNIGHT, Superintendent,
Correctional Industrial Facility,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-1097-JMS-TAB — **Jane E. Magnus-Stinson**, *Judge.*

ARGUED APRIL 13, 2016 — DECIDED SEPTEMBER 13, 2016

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Following a bench trial in Indiana state court, William Hinesley, III, was convicted of molesting his 13 year-old former foster daughter, V.V. After exhausting his state court remedies, Hinesley petitioned for a writ of habeas corpus, contending that his trial counsel deprived him of effective representation when he allowed the inculpatory

out-of-court statements of the two principal witnesses against him into evidence without objection and likewise posed no objection to the admission of two statements in which witnesses vouched for V.V.'s credibility. Hinesley also raised an argument of cumulative ineffectiveness based on these and other purported errors on the part of his lawyer. The district court denied his petition. *Hinesley v. Knight*, No. 1:14-cv-1097-JMS-TAB, 2015 WL 1969643 (S.D. Ind. Apr. 29, 2015). We affirm.

## I.

Because there was no physical evidence of Hinesley's guilt, the State's case rested almost entirely on the testimony of the victim, V.V., and, to a lesser extent, her (former) foster brother, William Hinesley, IV, who was known as Billy. Prior to trial, both witnesses had made statements that conflicted with the initial accounts they had given to the investigating detective. It had also become known that V.V. and Billy were in a sexual relationship with one another at the time of the charged offense and, because that relationship was unlawful (given their respective ages), they wanted to keep the relationship hidden. When the case came to trial, it was defense counsel's strategy to allow all of the prior statements V.V. and Billy had made into evidence without objection or limitation in order to lay bare the inconsistencies in those statements and to argue that neither witness was credible in view of the conflicts. The State understood that this was the defense strategy and at trial elicited the initial, inculpatory out-of-court statements of V.V. and Billy at some length, with no objection by the defense. Defense counsel also made no objection to the admission of statements by the investigating detective and by Billy that they

believed V.V.'s account. The defense took every opportunity to highlight the ways in which V.V. and Billy subsequently had changed their stories and to suggest that the investigation of V.V.'s allegations was inadequate. The trial judge nonetheless convicted Hinesley, finding that V.V.'s testimony was credible. His counsel's strategy having failed, Hinesley now contends that his attorney was ineffective for permitting the State to elicit the out-of-court statements of V.V. and Billy as substantive evidence, rather than eliciting the statements himself on cross-examination as impeachment, and in allowing the two instances of vouching by the State's witnesses. These and certain other omissions form the basis for a separate assertion of cumulative ineffectiveness.

We begin with a summary of the facts relevant to Hinesley's conviction. V.V. had been taken into the Hinesley family as a foster child. V.V. was happy in the Hinesley home, but Hinesley's wife Sharon eventually concluded that the placement was not a good one, as there was some tension between herself and V.V. In the autumn of 2008, V.V. was removed from the Hinesley household and placed with Hinesley's parents. But V.V. continued to periodically visit Hinesley and his family. (She is thus frequently described in the record as Hinesley's foster daughter notwithstanding the change in placement.) V.V. was present for such a visit in the Hinesley home on the evening of Friday, January 16, 2009, when the assault underlying Hinesley's conviction occurred. The facts forming the basis for Hinesley's conviction were summarized by the Indiana Court of Appeals in affirming the conviction on direct appeal:

On the night of January 16, 2009, the Hinesley family was at home in Paragon, Indiana. Hinesley, his son, William J. Hinesley, IV ("Billy"), who was twenty years old at the time, a foster daughter, V.V., who was thirteen years old at the time, and others were present. Eventually, Hinesley and V.V. were the only ones awake. They sat on a couch in the living room and talked as they watched a movie. Next, Hinesley got up and went into the kitchen. When he returned, he approached V.V. and pulled down her pants and underwear. Hinesley got on top of V.V. and put his penis in her vagina. After a short period of time, V.V. tried to push Hinesley away, and he got up and left the room. V.V. got up and pulled up her pants.

Meanwhile, Billy was going to the kitchen to get a glass of water. He encountered V.V., who told him that she had just had sex with Hinesley. Billy sent V.V. to the master bedroom while he woke his sister, S.H., and had her go into the master bedroom with him and V.V. In the morning, Billy contacted his uncle, who was a police officer in Mooresville, Indiana, and the local police were contacted.

*Hinesley v. State*, 957 N.E.2d 217 (table), 2011 WL 5117056, at *1 (Ind. Ct. App. Oct. 27, 2011) (unpublished).

V.V. and Billy both gave videotaped statements the following morning to Morgan County Sheriff's Detective Dan

Downing. V.V. described the events as recounted above. Billy indicated in his statement that he had approached the living room just as V.V. was pulling her pants up. He asked V.V., "[D]id I see what I thought I saw?" and V.V. nodded and told him that he had. State Ex. 2 at 12:04. It was then that V.V. informed him that Hinesley had sexually assaulted her.

What neither V.V. nor Billy disclosed to Downing was that they were engaged in a sexual relationship with one another. In fact, although she did not yet know it, V.V. was pregnant with Billy's child (she gave birth in August 2009) at the time of the assault by Hinesley. The relationship between V.V. and Billy is described as consensual, but given their respective ages, it constituted child molestation as a legal matter. Billy would eventually plead guilty to that offense once the relationship came to light.

Subsequently, both V.V. and Billy made statements that were either wholly or partially inconsistent with what they had told Downing. One week after the incident, V.V. told Hinesley's mother that she had made the whole thing up. When later deposed by defense counsel in advance of trial, V.V. acknowledged the recantation but then testified that Hinesley had, in fact, assaulted her. But she also professed uncertainty as to certain key details of the assault, including whether Hinesley had actually placed his penis into her vagina. Billy was also deposed prior to trial, and during his deposition he said that he could no longer remember whether he had seen V.V. pulling up her pants in the immediate aftermath of the incident.

As we have said, there was no physical evidence confirming V.V.'s account of the assault. Both V.V. and Hinesley were examined on the morning after the assault, but in neither case was the presence of DNA from the other individual detected.[1] On the other hand, Hinesley had shaved the pubic hair from his body at some point prior to his examination (he would later testify that he and his wife both did this as a matter of routine). Also, during a search of the Hinesley home on the morning after the incident, police discovered a pair of still-wet pajama pants and underwear in the dryer by themselves, despite there being dirty clothing piled in the hallway nearby and throughout the house. Hinesley had been wearing pajama pants and underwear the previous evening, although police were unable to determine whether the pajamas and underwear in the dryer were the ones Hinesley had been wearing.

On the morning of trial, the State offered to drop the multiple child molestation charges against Hinesley if he agreed to plead guilty to a misdemeanor charge of battery, with credit for the time Hinesley had already served in jail prior to trial along with a period of probation, and with no

---

[1]  Oddly, the written summary of V.V.'s examination indicated that her hymen was intact. That report was not introduced into evidence at trial, possibly because Hinesley's trial counsel never saw the report. (Neither the prosecutor nor defense counsel could later recall whether the report had been possessed by the State and produced in discovery.) In this appeal, Hinesley has cited counsel's apparent failure to obtain a copy of the report—and in any event, his failure to introduce it at trial—not as a freestanding instance of purported ineffectiveness but rather as one of the grounds for his argument of cumulative ineffectiveness.

requirement that he register as a sex offender. Hinesley rejected the offer against his attorney's advice.

The case proceeded to trial on three child molestation charges: (1) that Hinesley had engaged in sexual intercourse with a child less than 14 years of age, in violation of Indiana Code § 35-42-4-3(a)(1), then a Class A felony[2]; (2) that he had engaged in deviate sexual conduct with a child under 14 years of age, in violation of the same statute, again a Class A felony; and (3) that he had touched or fondled a child under 14 years of age with intent to arouse or satisfy the sexual desires of either himself or the child, in violation of § 35-42-4-3(b), a Class C felony. The State previously had dismissed a fourth charge— that Hinesley had touched or fondled his biological daughter, S.H. The parties agreed that the case would be tried to the bench.

As we have mentioned, it was defense counsel's strategy to elicit all of the various pre-trial, out-of-court statements that both V.V. and Billy had made so as to establish the changing nature of their accounts and to suggest that they were not credible as to the alleged assault by Hinesley. Defense counsel thus posed no objection when, during the State's case, the prosecution asked both Downing and Billy to recount certain out-of-court statements that both V.V. and Billy had made. We shall return to these statements after we first summarize the trial testimony of witnesses Downing, V.V., and Billy.

Downing was the first of these witnesses to testify for the State. He described his interviews of both V.V. and Billy, and

---

[2]   The classification system for felonies in Indiana has since changed.

recounted in full what they had told him about the assault. During his testimony, the video recording of Billy's 30-minute interview was played for the court in its entirety.

V.V. was the second of these witnesses to take the stand. She testified, consistently with her original statement to Downing, that after she and Hinesley were left alone in the living room of the Hinesley residence on the evening of January 16, 2009, the two of them watched a movie, with V.V. resting her head in Hinesley's lap. At some point, Hinesley had gotten up and gone into the kitchen. When he returned to the living room, he pulled down her pajama pants and underwear, placed himself on top of her, pinned down her shoulders, penetrated her vagina with his penis, and began to have intercourse with her. Stunned and not knowing at first what to do, V.V. after a moment "got a hold of [her]self," told Hinesley she wanted to go to bed, shoved him off of her, and then pulled up her pants. Tr. 117. As V.V. prepared to leave the room, she saw Billy in the nearby hallway, and he beckoned her over to him with a gesture. V.V. testified that Billy was "freaking out kind of, like he was upset and mad," Tr. 118, and he asked her if he had just seen what he thought he saw. She told him yes. At that point, he directed her to the master bedroom, where she informed Billy, using slang terminology, that Hinesley had sexually assaulted her.

On cross-examination, V.V. was confronted with the multiple statements she had made prior to trial that were inconsistent with her testimony (and her original interview with Downing). She acknowledged the recantation she had made to her foster grandmother one week after the incident; that recantation, she said, was a lie. She acknowledged that at

her deposition, she had expressed an inability to recall whether Hinesley had placed his penis into her vagina. At first, she confirmed that she was uncertain about this point at the time of her deposition. Ultimately, however, she conceded that her professed inability to recall was a lie. She acknowledged having lied about various other points during her deposition. She also admitted that she was engaged in a sexual relationship with Billy at the time of the assault and that she knew it was wrong.

Billy reiterated at trial that V.V. told him his father had sexually assaulted her, but he professed uncertainty as to whether he had seen V.V. pulling up her pants as he had told Downing he had on the day after the incident. Although he recalled what he had told Downing, Billy testified that "[a]t this point in time I do not remember what I saw." Tr. 170. When pressed on that point by defense counsel, he allowed that he "could have" lied about that to Downing, Tr. 179, and agreed with Hinesley's attorney that "there's a good chance that [he] didn't see anything at all," Tr. 178. He acknowledged that when he was interviewed by the police, he knew that he himself could be charged criminally for his conduct with V.V., was afraid of being exposed, and that he had lied to the police about his relationship with V.V. Billy was otherwise a hesitant witness who repeatedly claimed a lack of recollection as to various points and often gave inaudible answers to questions.

Hinesley himself testified in his own defense. He denied that he had ever molested V.V. He further denied that he had ever been alone with V.V. on the night in question.

Having summarized the testimony of the principal witnesses at Hinesley's trial, we now pause to focus on certain of the out-of-court statements that came into evidence while Downing and Billy were on the witness stand. These are the inculpatory statements that form the basis for Hinesley's first (and principal) argument that his trial counsel was ineffective.

### Downing's summary of V.V.'s interview

As we have noted, Downing summarized the interviews he conducted of both V.V. and Billy on the morning after the assault. With respect to his interview of V.V., Downing testified, "[V.V.] then stated that [Hinesley] made penetration into her vaginal area[,]" and similarly, "At that point in time she stated that Mr. Hinesley told her to pull her pants down, at which point in time he inserted … his penis into her vagina." Tr. 25.

Downing also reiterated later in his testimony that V.V. had advised him that the assault by Hinesley involved "actual penetration." Tr. 28. (We note that V.V.'s interview, like Billy's, was videotaped, but the videotape of her interview was not played at trial.)

### Downing's summary of Billy's interview

Summarizing Billy's original statement, Downing testified in relevant part that "[Billy] asked [V.V.] if he seen what he thinks he … or if he seen what he thought he had saw, and [V.V.] said, yes." Tr. 18.

### Billy's videotaped statement

As we have noted, the videotape of Billy's interview with Downing was played during Downing's testimony. Hinesley

highlights two statements from that interview. First, Billy recounted that upon entering the living room, "I asked [V.V.]. All I said was … did I see what I thought I saw? She nodded and said yes." State Ex. 2 at 12:04. Second, in describing his follow-up conversation with V.V., Billy said, "I guess I asked her did he touch you in some spot. She said yes. And … she told me that he entered her." State Ex. 2 at 12:39.

**Billy's testimony as to what V.V. told him**

Finally, at trial, Billy testified that "[V.V.] told me that they had sexual intercourse." Tr. 194.

These out-of-court statements (some of which constituted hearsay within hearsay) were presumptively inadmissible for the truth of the matters asserted therein. *See* Ind. R. Evid. 801(c), 802. The prosecutor testified at Hinesley's post-conviction hearing that she understood the statements to be admissible, at least in part, in order to explain the course of Downing's investigation. *But see Craig v. State*, 630 N.E.2d 207, 210-11 (Ind. 1994) (out-of-court statements made to police offered to explain course of investigation lack relevance when the defense does not dispute what investigating authorities were told or the propriety of the steps they took); *see also Maxey v. State*, 730 N.E.2d 158, 161-62 (Ind. 2000). However, the prosecutor also testified that based on her pre-trial discussions with defense counsel, she understood it would be the defense strategy to elicit and/or allow the admission of these same out-of-court statements in order to highlight the inconsistencies and to challenge the credibility of V.V. and Billy. In any case, Hinesley's position is that once the statements were elicited without objection, the trial judge as the factfinder was free to

consider them as substantive evidence for any purpose. *See Marcum v. State*, 725 N.E.2d 852, 863 (Ind. 2000) (in examining trial record for sufficiency of evidence supporting defendant's conviction, reviewing court may consider otherwise inadmissible evidence admitted without objection as substantive evidence) (quoting *Humphrey v. State*, 680 N.E.2d 836, 840 (Ind. 1997)).

In addition to the various out-of-court statements, there were two instances in which the State's witnesses expressed their opinion as to the credibility of V.V. Downing was the source of one of these opinions and Billy, in his videotaped statement to Downing, was the source of the other. In neither instance did defense counsel raise an objection to the relevant statement, and as we discuss below, Hinesley asserts that the failure to object allowed these two witnesses to improperly vouch for V.V.'s credibility. Here are the two statements in question:

**Downing**. In the course of Downing's testimony, the State at one point asked Downing to describe V.V.'s demeanor during the interview on the morning after the assault. Downing responded:

> Relatively childlike. She was very protected, very guarded. She acted much younger than … than her physical age. But she seemed very believable. I didn't see any reason not to believe her statements, especially due to the fact they were corroborated by … by Billy.

Tr. 23.

**Billy**. Billy's statement as to V.V.'s credibility was uttered in the course of his videotaped interview rather than during his trial testimony. Near the end of that interview, Billy had remarked to Downing: "I don't believe she made this up." State's Ex. 2 at 28:52.

At the conclusion of the State's case, the court dismissed two of the three charges against Hinesley—the deviate sexual conduct charge and the touching or fondling charge. The State had conceded that there was no evidence to support the former and that the latter was based solely on V.V.'s testimony that intercourse had occurred.

At the conclusion of the defense case (there was no rebuttal by the State), and after hearing closing arguments, the judge convicted Hinesley on the Class A felony charge that he had molested V.V. The judge remarked that defense counsel had done "an excellent job" in pointing out the inconsistencies in the various statements of the State's witnesses. Tr. 277. However, the judge went on to note that in opting for a bench trial, the parties had "left it in [her] bailiwick" to make credibility determinations, Tr. 278, and she expressly found V.V.'s testimony to be credible. She later sentenced Hinesley to a prison term of 30 years, 5 of which are to be served as probation.

After his conviction was affirmed on direct appeal, Hinesley sought post-conviction relief, alleging principally that his trial counsel had been ineffective in various respects. As relevant here, he contended that counsel erred in allowing the prior out-of-court statements of both V.V. and Billy into

evidence without objection or limitation and in allowing both Downing and Billy to vouch for V.V.'s credibility. Hinesley's petition was assigned to the same judge who had presided over the trial and convicted him. She convened an evidentiary hearing on the petition, at which Hinesley's trial counsel, Daniel Vandivier, testified. Vandivier explained that it was the defense theory that V.V. and Billy, for ulterior reasons (including the effort to hide their own relationship), had fabricated the alleged assault. In pursuit of that theory, it was Vandivier's goal to highlight all of the inconsistencies in the various statements that V.V. and Billy had given about the assault. Toward that end, Vandivier opted to forego any hearsay objections when the State's witnesses were asked to repeat certain of these out-of-court statements. As to the vouching, when specifically confronted at the hearing with Downing's testimony regarding V.V.'s credibility, Vandivier did not have a specific recollection as to why he did not object to that testimony; but he indicated that he may have withheld objection in order to argue that Downing gave unquestioning acceptance to V.V.'s account from the start and consequently never conducted an adequate investigation into what did or did not occur. He also believed that Downing's observation that V.V.'s statements were corroborated by Billy rendered Downing's credibility assessment vulnerable, given that Billy no longer stood behind his initial statement that he saw V.V. pulling her pants up after the assault.

The trial judge denied Hinesley's request for post-conviction relief. The trial court found that "Mr. Vandivier's failure to object to hearsay evidence from the various witnesses during the trial was a trial strategy and was reasonable under

the unique circumstances of this case[.]" R. 14-4 at 60 ¶ 11. The court added that regardless of any hearsay admitted into evidence, its own determination that V.V. was a credible witness and that she testified truthfully regarding the assault was sufficient to uphold Hinesley's conviction regardless of any hearsay admitted into evidence without objection. R. 14-4 at 60 ¶ 12. (The court did not expressly address the vouching statements in her findings.)

The Indiana Court of Appeals affirmed. *Hinesley v. State*, 999 N.E.2d 975 (Ind. Ct. App. 2013). With respect to the out-of-court statements that were not objected to, the court pointed out that "Hinesley concedes that the hearsay evidence was admissible for impeachment purposes, and therefore the evidence was going to be admitted in one form or another." *Id.* at 984. The court found no error in the trial court's conclusion that defense counsel's decision to allow the statements into evidence without limitation as part of a broader strategy to lay out all of the inconsistencies in the statements made by V.V. and Billy was a reasonable trial strategy. *Id.* It pointed out that counsel's strategy may have been partially successful to the extent that the trial judge had dismissed the other two child molesting counts. *Id.* As to the vouching, the court noted that although Vandivier was not able to specifically explain his reasons for not objecting, courts typically do not insist that counsel confirm each aspect of their trial decisions. *Id.* at 985. The court found that Vandivier's decision not to object to the vouching was consistent with his overall trial strategy "and was not unreasonable under the circumstances." *Id.* It added that because the case had been tried to the bench, the usual concern regarding the influencing that vouching might have

upon on the jury was not present. *Id.* In any event, the court was not convinced that the vouching prejudiced Hinesley. "[T]he record reveals that the two statements were isolated and not pervasive and did not affect the outcome of the trial. We are unpersuaded that but for counsel's failure to object to the alleged improper vouching statements, there is a reasonable probability that the verdict would have been different." *Id.* at 985-86.

Finally, the court disposed of Hinesley's additional allegation of cumulative ineffectiveness—based on the foregoing and other omissions—on the ground that he had not established prejudice. The court noted that Indiana's judicial temperance doctrine presumes that a trial judge sitting as the factfinder knows the law and relies solely on relevant and probative evidence that is properly before the court in rendering his decision. *Id.* at 987 (citing *Konopasek v. State*, 946 N.E.2d 23, 28 (Ind. 2011), and *Conley v. State*, 972 N.E.2d 864, 873 (Ind. 2012)). In the court's view, Hinesley had not rebutted that presumption. The trial judge, in denying Hinesley's post-conviction petition, indicated that she had found V.V. credible in her account of the offense regardless of any hearsay that Vandivier had allowed into evidence without objection. *Id.* The fact that she dismissed two of the three counts against Hinesley bore her out, given that the only evidence supporting those charges was found in Downing's testimony as to what V.V. had told him. *Id.* at 987-88. And although the judge did not similarly disclaim any reliance on the vouching statements, the appellate court found no reason to believe that she had. *Id.* at 988. In this case, there was no person better situated to assess whether Hinesley had been harmed by his trial counsel's strategy than

the trial judge herself. The fact that she found no reasonable probability that the trial might have turned out differently had counsel pursued a different strategy was entitled to a greater than usual degree of deference, in the appellate court's view. *Id.*

Hinesley sought review in the Indiana Supreme Court, but that court denied his petition for transfer. *Hinesley v. State*, 7 N.E.3d 933 (Ind. May 1, 2014).

Hinesley then petitioned for relief in the district court pursuant to 28 U.S.C. § 2254. The district court denied his petition. 2015 WL 1969643. In relevant part, the court determined that the state courts had not unreasonably applied Supreme Court precedent in rejecting Hinesley's ineffectiveness claim as to the uncontested admission of hearsay and as to the vouching remarks by Downing and Billy. *Id.* at *3-*4. "[T]he Indiana Court of Appeals 'took the constitutional standard seriously and produced an answer within the range of defensible positions.'" *Id.* at *4 (quoting *Mendiola v. Schomig*, 224 F.3d 589, 591 (7th Cir. 2000)). The court found that it was precluded from considering the resolution of Hinesley's allegation of cumulative ineffectiveness, as that claim was procedurally defaulted. *Id.* at *3.

## II.

Hinesley's appeal pursues each of the three iterations of ineffectiveness that we have mentioned: that his counsel, by voicing no objection to the out-of-court statements of V.V. and Billy, improperly allowed those statements into evidence without limitation; that his counsel likewise allowed Downing and Billy to vouch for V.V.'s credibility without objection; and

finally that these and certain other omissions cumulatively deprived Hinesley of his right to the effective assistance of counsel. We review the district court's decision to deny relief on Hinesley's claim of ineffective assistance de novo. *E.g.*, *Ruhl v. Hardy*, 743 F.3d 1083, 1090 (7th Cir. 2014).

Like the district court, we must observe the constraints of section 2254 in evaluating the claim of ineffective assistance of counsel. As relevant here, the statute precludes a federal court from granting relief in habeas unless the state court's resolution of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" § 2254(d)(1). There can be no contention that the Indiana appellate court—the last state court to address Hinesley's claim on its merits—resolved his ineffectiveness claim in a manner "contrary" to clearly established federal law: the court recognized *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), as the controlling precedent and applied its familiar two-pronged framework. *See Bell v. Cone*, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005) (per curiam) (citing *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000)) (state court's decision is "contrary to" federal law if, inter alia, court applies rule that contradicts governing law set forth in Supreme Court cases). Hinesley's habeas petition is instead premised on the contention that the Indiana appellate court unreasonably applied *Strickland*.

*Strickland* itself requires that a convicted individual make two showings in order to prove that he was deprived of his right to effective assistance of counsel. First, he must show that his counsel's performance was deficient, that is, that his

attorney made errors so serious that he was not functioning as the counsel guaranteed to him by the Sixth Amendment. 466 U.S. at 687, 104 S. Ct. at 2064. In deciding whether the petitioner has made this showing, we must avoid "the distorting effects of hindsight" and instead assess his counsel's performance against the circumstances that confronted counsel at the relevant time—here, the trial. *Id.* at 689, 104 S. Ct. at 2065. Recognizing that "[t]here are countless ways to provide effective assistance in any given case," we must indulge a strong presumption that counsel's representation falls within a wide range of reasonable representation; and it is, of course, the petitioner's burden to overcome that presumption. *Id.* at 689-90, 104 S. Ct. at 2065-66. Second, the petitioner must show that he was prejudiced by his counsel's ineffective representation, i.e., that he was deprived of a fair trial whose result is reliable. *Id.* at 687, 104 S. Ct. at 2064. Specifically, he must demonstrate that there is a reasonable probability that but for his counsel's unprofessional errors, the result of the trial would have been different. *Id.* at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 104 S. Ct. at 2068.

In order for us to conclude that the Indiana appellate court's application of *Strickland* was unreasonable for purposes of section 2254, it is not enough that we might disagree with that court's rationale. "Over and over, the [Supreme] Court has stressed that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Ward v. Neal*, No. 16-1001, 2016 WL 4492479, at *3 (7th Cir. Aug. 26, 2016) (quoting *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 785 (2011)) (emphasis in *Richter*). "The *Richter* court

elaborated that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Richter*, 562 U.S. at 103, 131 S. Ct. at 786-87).

Our review is therefore "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009), in the sense that *Strickland*'s inquiry is "highly deferential" to a lawyer's plausible strategic choices, 466 U.S. at 689, 104 S. Ct. at 2065, and our review under section 2254(d) is likewise "highly deferential" to the state courts that resolved Hinesley's ineffectiveness claim in the first instance, *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

With these standards in mind, we turn to the first respect in which Hinesley contends his trial counsel was ineffective. Hinesley maintains that it was unreasonable for Vandivier not to object on hearsay grounds to the admission of the out-of-court statements made by V.V. and Billy to Downing at the outset of his investigation. Vandivier testified that he made the decision not to object because his strategy was to lay out the multiple inconsistencies in the various statements V.V. and Billy had made and thus to convince the trial judge that neither of them should be credited. The Indiana Court of Appeals, of course, found that this was a reasonable if unsuccessful strategy, and that Hinesley was not, in any event, prejudiced by the admission of these statements into evidence. For multiple reasons, the Indiana court's resolution of this point was not an unreasonable application of *Strickland*.

First, it bears noting that it has been undisputed throughout this litigation that these out-of-court statements would have been admissible—and, pursuant to defense counsel's strategy, would have been elicited—along with the other statements that V.V. and Billy made in order to show how their accounts changed over time and thus to impeach their credibility. So it is not Hinesley's position that the defense should have fought to exclude these statements altogether. Rather, Hinesley's objection is that by remaining silent as the State introduced these statements through Downing and later Billy, defense counsel allowed the statements into evidence with no limitation, so that the trial judge as the factfinder could consider them for their truth. Secondarily, Hinesley posits that allowing the State to elicit these statements in the first instance enabled the prosecution to present the strongest version of its case at the outset of the trial: Downing was able to recount what V.V. and Billy told him about the assault (and indeed Billy's interview was played in full) without their accounts being subject to cross-examination until they each took the witness stand later in the case. But, again, Hinesley is not suggesting that the factfinder should never have been exposed to these statements (although he does say that the video recording of Billy's interview should never have been played); he is arguing that his counsel should not have permitted the statements to have been elicited by the prosecutor and without limitation on the purposes for which they could be considered.

Second, as the two percipient witnesses, it was a given that both V.V. and Billy would testify in the State's case and that they would give accounts similar to, if not precisely the same as, the accounts they had given to Downing in their original

statements.[3] To be sure, both had wavered in their accounts in
advance of trial, with V.V. having recanted her accusation
entirely at one point and Billy having disclaimed any memory
of what he might have seen. But at their pre-trial depositions,
V.V. had repeated her core accusation that Hinesley raped her,
and Billy had confirmed what V.V. had told him about that
assault. It was a reasonable assumption that they would do so
again at trial. So from the defense perspective, there was little
to be lost by allowing the State to elicit their original state-
ments. The statements, at worst, would preview (and dupli-
cate) their trial testimony.

Of course, as trial witnesses, both V.V. and Billy would be
subject to cross-examination as to the content of their out-of-
court statements. Indeed, that was the point of the defense
strategy—to open the door to these and all of the other
statements the two had made about events and to showcase all
of the inconsistencies among them for the judge during cross-
examination and argument. Given that their prior statements
would be elicited in one way or another, it was not unreason-
able for defense counsel to allow the State to elicit them in the
first instance.

And with one material exception, V.V. and Billy did not
deviate in their trial testimony from the pre-trial statements
that are at issue here. To that extent, these statements were

---

[3] There were certain minor inconsistencies between their original state-
ments to Downing and their trial testimony. For example, at trial, V.V.
testified that Hinesley had pulled her pajama pants down during the
assault, whereas she had told Downing that Hinesley had directed her to
pull them down.

simply cumulative of what these two witnesses recounted at trial. The one exception was Billy's statement (or rather question) to V.V.: "Did I see what I think I saw?" That statement, of course, suggested that Billy had seen V.V. pulling up her pants in the immediate aftermath of the assault (as, indeed, Billy had told Downing he had), and lent an important degree of corroboration to V.V.'s account—assuming it withstood scrutiny. But although Billy made that statement in his videotaped interview with Downing, he thereafter backed away from it. At trial, Billy not only reiterated that he had no recollection of what he may have seen, but admitted that "there's a good chance that [he] didn't see anything at all," Tr. 178, and that he "could have" lied when he told Downing that he had seen something, Tr. 179. If anything, the admission of this statement/question served to highlight the degree to which Billy had backtracked from his initial interview and was unwilling to stand by the veracity of what he had told Downing.

Consistent with his declared strategy, counsel did drive home each and every one of the inconsistencies among the statements that V.V. and Billy had made over time. Vandivier advised the judge in his opening statement that she was "going to hear inconsistent statement after inconsis[tent] statement," Tr. 6, and he made good on that promise. His cross-examination of both witnesses was thorough, and in fact, both V.V. and Billy freely acknowledged the differences in the statements they had made over time.

Under these circumstances, we can by no means say that the Indiana Court of Appeals was unreasonable in concluding that counsel's strategy was not ineffective. Counsel had the

benefit of a pre-trial run-through with both V.V. and Billy at
their depositions and knew what the inconsistencies in their
statements were and, also, that they would acknowledge them.
The risks of allowing the prosecution to elicit their original
statements, and without limitation as to the purpose for which
those statements could be considered, were low. With the
judge serving as the trier of fact, it was unlikely that undue
weight would be given to the witnesses' out-of-court state-
ments as opposed to their in-court testimony. The judge would
understand that a witness's testimony given under oath, in the
judge's presence, and subject to cross-examination is the most
relevant substantive evidence and manifestation of his candor,
and that his out-of-court statements are principally relevant to
the extent they show consistency or inconsistency in the
accounts he has given over time. There is no disagreement that
the defense had to elicit each of the witnesses' out-of-court
statements in order to expose the significant inconsistencies
among those statements; *how* the statements were elicited
ultimately would not have mattered much, if at all, to the
factfinder.

Nor did the state court conclude unreasonably that
Hinesley suffered no prejudice from his counsel's decision not
to object or attempt to limit the use of the statements, even
assuming the strategy was faulty. As we have already made
clear, there was only one instance in which the out-of-court
statements were not cumulative of the trial testimony of V.V.
and Billy, and that was in Billy's purported question to V.V.:
"Did I see what I think I saw?" But as we have already dis-
cussed, that question hardly hurt the defense, given Billy's
dual admissions on the witness stand that he no longer recalled

what, if anything, he had seen and, more importantly, that he may have lied when he told Downing that he saw V.V. pulling up her pants. Yes, allowing the State to elicit such statements on direct examination of its witnesses (Downing, principally) enabled it to put on a somewhat more straightforward and stronger case at the start of the trial, in the sense that it was able to lay out the case as it was presented to Downing. But any advantage that may have given the State was short-lived, given defense counsel's relentless cross-examination of both V.V. and Billy as to the significant retractions and inconsistencies in their accounts. In the end, the judge chose to believe V.V. and the account she gave. It strains credulity to think that she might have rendered a different credibility assessment had the defense elicited each of the out-of-court statements as impeachment, on cross-examination, rather than allowing the State to elicit some of these statements in the first instance and without limitation. One may quibble, as Hinesley does, with the particular words the judge used when she rejected Hinesley's argument on this point at the post-conviction stage (she said her credibility finding as to V.V. "[wa]s sufficient" to uphold Hinesley's conviction "regardless of any hearsay admitted without objection," R. 14-4 at 60 ¶ 12, rather than saying explicitly that the hearsay did not materially affect her decision), but the clear import of her finding was that V.V.'s credible testimony in court was what was essential to her decision to convict Hinesley. That is what the Indiana Court of Appeals understood the judge to mean, 999 N.E.2d at 987-88, and that is an entirely reasonable interpretation of her finding.

Our discussion of the vouching question may be brief. Even if we were to agree with Hinesley that there was no plausible

strategic reason to allow the vouching statements into evidence, Hinesley's ineffectiveness argument would nonetheless fail for want of prejudice. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 (court need not decide whether counsel was ineffective before turning to whether defendant was prejudiced). The two statements—one in court, one out of court—were isolated, were not belabored, were not cited by the State in its closing argument, and were highly unlikely to have influenced the judge's assessment of guilt. It was no surprise that Downing believed V.V.—the course of his investigation demonstrated that belief just as clearly as his statement did. If anything, his statement lent itself to the point the defense was making at trial—that Downing too soon accepted V.V.'s account at face value, not realizing that V.V. and Billy were engaged in an illicit relationship and shared an incentive to keep that relationship hidden from the authorities. It was likewise unremarkable that Billy would say he believed V.V., given that the two of them were intimately involved with one another. What would have mattered to the judge in deciding whether to believe V.V. was not the impressions of Downing and Billy but rather the credibility of V.V.'s testimony at trial in the presence of the judge, which is what the prosecutor herself focused on in closing.

Hinesley last contends that the state courts improperly rejected his contention that his counsel was cumulatively ineffective; but we agree with the district court that Hinesley did not give the state courts a full and fair opportunity to address the claim. *See Duncan v. Walker*, 533 U.S. 167, 178-79, 121 S. Ct. 2120, 2127-28 (2001); *Johnson v. Loftus*, 518 F.3d 453, 455-56 (7th Cir. 2008). There is no doubt that the claim was

presented to the Indiana Court of Appeals, which rejected the
claim on its merits. But the relevant question is whether
Hinesley fully and fairly presented it to the Indiana Supreme
Court in the petition for transfer to that court. *See O'Sullivan v.
Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732-33 (1999).
Hinesley's transfer petition in relevant part focused on the
judicial temperance doctrine, which the appellate court had
cited as a central reason for rejecting his cumulative ineffective-
ness claim. Hinesley argued that the appellate court was
wrong as a matter of fact when it invoked the presumption
notwithstanding what he perceived as signals from the trial
judge, in her opinion denying postconviction relief, that she
*had* relied on unobjected-to hearsay in convicting Hinesley. The
problem, for Hinesley, is that although his petition mentioned
*Strickland* in passing, the argument as presented was that the
state appellate court wrongly applied a state rule, which is
ordinarily not a matter of concern for a federal habeas court.
*See Swarthout v. Cooke*, 562 U.S. 216, 219, 131 S. Ct. 859, 861
(2011) (per curiam). Compounding the problem is that the
transfer petition not only never used the word "cumulative" to
distinguish his argument of cumulative prejudice from his
arguments of individual ineffectiveness, but in the pertinent
section focused solely on the subject of hearsay and said
nothing about the multiple other bases for his cumulative
argument.[4] In short, Hinesley never presented a discernible
argument of cumulative ineffectiveness to the Indiana Su-

---

[4] For example, the transfer petition noted the rejection of Hinesley's
argument as to vouching in its procedural summary, but did not mention
vouching again in the relevant argument portion of the petition.

preme Court. The district correctly found that this amounted to a procedural default that precluded federal review of the claim.

**III.**

We AFFIRM the denial of Hinesley's petition for a writ of habeas corpus.