In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-1001

ROY L. WARD,

*Petitioner-Appellant*,

*v.*

RON NEAL, Superintendent,
Indiana State Prison,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:12-cv-00192-RLY-WGH — **Richard L. Young**, *Chief Judge*.

ARGUED AUGUST 18, 2016 — DECIDED AUGUST 26, 2016

Before WOOD, *Chief Judge*, and EASTERBROOK and ROVNER,
*Circuit Judges*.

WOOD, *Chief Judge*. Roy L. Ward is under a sentence of
death for the brutal murder of Stacy Payne, just 15 years old
at the time of the crime. He pleaded guilty to the charge at his
second trial; a jury recommended death; and the trial court
sentenced him accordingly. His conviction and sentence have
passed muster through all the appropriate stages of review in

the state courts, and the district court found no reason to disturb their conclusions when Ward sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254. His primary ground for relief, and the only theory he pursues on appeal, is that his trial counsel rendered constitutionally ineffective assistance when they portrayed him as a dangerous, incurable "psychopath" to the jury, and that this failing is enough to undermine confidence in the sentence. We conclude, however, that the Indiana Supreme Court's decision that Ward suffered no prejudice from counsel's shortcomings was reasonable. This is enough to require us to affirm the district court's judgment denying the petition for a writ of habeas corpus.

**I**

We will be brief with the underlying facts, as most of them are not disputed and they are horrifying. Shortly after noon on July 11, 2001, 15-year-old Stacy Payne opened the front door of her home in Dale, Indiana, and found a stranger—Ward—ostensibly looking for a lost dog. Ward was lying. Shortly after Stacy let him in, her sister Melissa, who had been upstairs taking a nap, woke to the sound of screams. Looking down from the top of the stairs, she saw Stacy on the ground with a man on top of her. Stacy was screaming as the man assaulted her. Melissa promptly went to her parents' room and called 911; police arrived about ten minutes later.

Dale Town Marshal Matt Keller was the first to enter the house. He saw Ward standing near the door with a knife in his hand, sweating. Keller immediately took Ward into custody, moved Ward outside, and went back into the house. There he saw Stacy lying in a huge pool of blood in the kitchen, disemboweled, evidently raped, trying to speak. Keller watched over her while he waited for an ambulance. The

Emergency Medical Technicians did what they could to stabilize her for transport and took her to a local hospital, from which she was later moved by helicopter to a Level One trauma center in Louisville. Doctors there tried to save her, but to no avail; she died approximately four or five hours after the attack. Although her wounds were awful—her throat was severed to the back of her windpipe, her midsection was almost completely cut apart, and her left hand had been slashed to the bone—she was still able for some time to communicate with the nurses by squeezing her hand.

There was never any doubt that Ward was the person who had murdered Stacy so violently. The proceedings focused instead on the penalty that he should receive. He was first indicted and tried on capital charges in Spencer County, Indiana, where Dale is located. Ward's attorneys at this trial tried through the use of mitigating evidence to convince the jury that death was not appropriate. They introduced evidence of Ward's troubled upbringing, his difficulties in school, his psychological problems, his obsession with exposing himself (for which he had some 32 convictions), and his previous good deeds. That strategy failed. The Spencer County jury convicted him and recommended death, and the trial judge accepted its advice. On appeal to the Indiana Supreme Court, however, his conviction and sentence were vacated, because the court found that he had been denied his right to a fair trial when his motion for a change of venue was denied. A fair trial in Spencer County, it said, would have been impossible. *Ward v. State* (*Ward I*), 810 N.E.2d 1042, 1050 (Ind. 2004).

We are concerned with Ward's second trial, at which he was represented by attorneys Lorinda Youngcourt and Steven Ripstra. They had handled his appeal to the Indiana Supreme

Court and were thus familiar with his case. The judge for the new trial was Robert J. Pigman, an appointed special judge; the trial was conducted in the Vanderburgh County Superior Court, with a jury venire drawn from Clay County. After the trial court denied Ward's motion to dismiss the state's request for the death penalty, he pleaded guilty to murder and Class A felony rape, and the state agreed to dismiss the charge of criminal deviate conduct (which supported one aggravating circumstance for purposes of the death penalty). Ward requested a jury for his penalty trial.

Although Youngcourt in particular was an experienced criminal defense lawyer who had handled numerous capital cases, she was quite overextended when she undertook to represent Ward at his second trial. Two of her clients had "real" execution dates, which she was trying to have set aside. Another client was under a federal sentence of death and Youngcourt was handling his motion under 28 U.S.C. § 2255. Finally, she was in the early stage of preparing for two additional capital trials. Perhaps that is why she exercised such poor oversight over a social worker, Micki Delph Rushton, whom she had hired to develop mitigation evidence. They had counted on using materials that had been developed for the first trial, but the file turned out to be very thin, and they concluded that they needed to start from scratch.

Ruston did very little on the case, though she ultimately completed 12 comprehensive witness interviews out of some 45 that Youngcourt wanted. (Most of the people on this list had knowledge of Ward's convictions for exposing himself.) Youngcourt was able to secure a continuance of the trial, which had been set for October 2006. In January 2007 there was a conference to set a new trial date. Youngcourt asked for

a year, but the court gave her only until May 7, 2007. Youngcourt describes her state of readiness for that trial as "zero." It then turned out that Rushton's life was "falling apart" and that she had "a bad drinking problem."

Youngcourt filed several other motions for continuances, but the court denied them. She retained other witnesses, including a mitigation investigator who abandoned the case after one day. She also retained a mental health consultant, Dr. George Parker, but he did not meet Ward until the end of March. She eventually also hired Dr. Alan Friedman, who was supposed to conduct neuropsychological testing but did not. He did, however, interview Ward during three visits to the prison, and he reviewed substantial materials that Youngcourt had furnished. Ultimately, the defense team decided not to stress mitigation, but instead to emphasize Ward's serious psychological problems. Dr. Friedman thought that Ward was a "psychopath," and Dr. Parker agreed.

That was what the jury heard at the penalty trial, which began on May 9, 2007. It also heard Dr. Friedman's opinion that Ward should never be "on the streets" because he was born without a conscience. James E. Aiken, a former Commissioner of the Indiana Department of Correction, testified that Indiana had the ability safely to incarcerate a psychopath such as Ward. Drs. Friedman and Parker, unhelpfully for Ward, thought that he would be more dangerous than the average prisoner, and Dr. Parker opined that Ward might be a threat to someone in the prison who was smaller or weaker than himself, or perhaps someone whom Ward caught in a moment when Ward had the upper hand.

The lawyers also introduced mitigating evidence at the second trial; witnesses discussed his bad parental modeling

(his father was also an exhibitionist), his attention deficit hyperactivity disorder, his learning difficulties, his depression, and his psychopathy. Counsel did not have much material that they could use to humanize Ward, but they tried nonetheless to introduce what they could. As we noted, the jury recommended death; the trial court accepted that recommendation; and it sentenced Ward to death on June 8, 2007. The Indiana Supreme Court affirmed on direct appeal from the second trial. *Ward v. State* (*Ward II*), 903 N.E.2d 946 (Ind. 2009). Ward sought post-conviction relief in the state court, but the trial court denied his petition after an evidentiary hearing, and the Indiana Supreme Court again affirmed. *Ward v. State* (*Ward III*), 969 N.E.2d 46 (Ind. 2012). Ward then filed his petition under 28 U.S.C. § 2254, which the district court denied, paving the way for this appeal.

## II

The sole issue Ward presents is "[w]hether trial counsel were ineffective when they failed to adequately investigate and present readily available mitigating evidence; and, due to their lack of preparation, instead presented Ward as a dangerous, incurable, remorseless 'psychopath.'" As the Indiana Supreme Court recognized in *Ward III*, this claim must be analyzed "under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984)." *Ward III*, 969 N.E.2d at 51. *Strickland*, as the state supreme court went on to recognize, requires a petitioner to show two things in order to prove a Sixth Amendment violation: first, that counsel's performance was deficient, by showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;"; and second, that "the deficient performance prejudiced the defense," by

depriving the defendant of a trial whose result is reliable.
466 U.S. at 687

*Strickland* left no doubt that these are two independent,
and equally essential, requirements for the petitioner. Its com-
ments on this point are helpful in the present case:

> Although we have discussed the performance
> component of an ineffectiveness claim prior to
> the prejudice component, there is no reason for
> a court deciding an ineffective assistance claim
> to approach the inquiry in the same order or
> even to address both components of the inquiry
> if the defendant makes an insufficient showing
> on one. In particular, a court need not determine
> whether counsel's performance was deficient
> before examining the prejudice suffered by the
> defendant as a result of the alleged deficiencies.
> The object of an ineffectiveness claim is not to
> grade counsel's performance. If it is easier to dis-
> pose of an ineffectiveness claim on the ground
> of lack of sufficient prejudice, which we expect
> will often be so, that course should be followed.

*Id*. at 697.

We find that this is one of those cases that is easier to re-
solve on prejudice, and so we turn immediately to that point.
Ward has something to say about it, although he spent most
of his brief detailing the many ways in which he believes that
the performance of his trial lawyers was deficient. Only at
page 48 out of 53 does he turn to the Indiana Supreme Court's
finding that whatever errors counsel made, and however de-
ficient the additional evidence gathered at the post-conviction

stage may have shown them to be, he cannot show prejudice, as *Strickland* uses that term. See *Ward III*, 969 N.E.2d at 67.

The Supreme Court's test for prejudice is a familiar one to those who spend any time with habeas corpus cases:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. Applying this test, the Indiana Supreme Court wrote that:

> After weighing the totality of the mitigating evidence [including that produced at post-conviction] against the evidence in aggravation, we conclude that Ward was not prejudiced by any inadequacies in his trial counsel's performance … There is no reasonable probability that the additional evidence presented at the PC hearing would have changed the jury's verdict.

*Ward III*, 969 N.E.2d at 72.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which amended 28 U.S.C. § 2254(d), we must respect this finding of the state's highest court unless the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In making that determination, we do not assess the issues on our own; we decide only whether the state court either invoked the wrong

legal standard or applied the correct standard unreasonably. Over and over, the Court has stressed that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). The *Richter* Court elaborated that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." 562 U.S. at 103.

With that intentionally demanding statutory standard in mind, even assuming that Ward's attorneys performed deficiently when they pounded into the jury's mind the idea that Ward is a psychopath—not merely someone suffering from severe antisocial personality disorder—we cannot say that the state court's conclusion that there was no prejudice was unreasonable. First, the state court unquestionably turned to the correct decision from the U.S. Supreme Court, and so there is no issue of a decision "contrary to" established law. Nor can we say that the Indiana Supreme Court unreasonably applied *Strickland*. The lay mitigation evidence that Ward gathered for the post-conviction proceedings would have shown, if credited, that he was a well-behaved and thoughtful child, who had an especially close relationship with his grandfather. It would also have underscored Ward's psychological problem with exhibitionism, hinting if not proving that this was something he either inherited from his father and grandfather, or maybe copied from them (both had the same problem). This evidence is not particularly strong, and it is largely cumulative of the mitigating evidence the second jury did hear.

Counsel at oral argument disclaimed any intention to rest Ward's case exclusively on the use of the word "psychopath," rather than the phrase "severe antisocial personality disorder." At the same time, she argued that studies have shown that juries have an especially negative reaction to the term "psychopath," and that it was appalling performance for Ward's attorneys to allow his experts to use the word. There is no doubt that Ward's lawyers faced a difficult choice: to portray Ward as somehow redeemable, and thus not deserving of death, or to portray Ward as so mentally damaged that the death penalty was inappropriate. The Indiana Supreme Court thought that their choice was defensible, but as we said, we do not need to reach the performance issue.

The reason why a reasonable state court could find that Ward was not prejudiced by his trial lawyers' strategy is easy to see. Against the mitigating evidence counsel did *not* use, and the psychological labels that *were* used, stood a mountain of stark evidence against Ward. He raped, tortured, and murdered an adolescent girl in an unbelievably brutal fashion. From the time Marshal Keller found him standing near the dying girl until the time of trial, Ward showed no remorse for his actions. He has admitted that he feels no remorse, and the jury undoubtedly observed his flat demeanor throughout the trial. No one was presenting an argument based on *Atkins v. Virginia*, 536 U.S. 304 (2002), that Ward was mentally retarded and thus not eligible for the death penalty (the record indicates his IQ is 79). And it is premature to address any possible argument under *Ford v. Wainwright*, 477 U.S. 399 (1986), that it would violate the Eighth Amendment to carry out Ward's sentence, because of "insanity."

The jury thus was asked whether a sentence of death was the proper one, in light of the presence of the aggravating circumstance that Ward committed the murder by intentionally killing the victim while committing rape, and the aggravating circumstance that he tortured and mutilated the victim while she was still alive. Finding no mitigating circumstances to outweigh these facts, the jury said yes, the trial court agreed, and their decisions were affirmed by the state supreme court.

## III

Applying the standards imposed by AEDPA, we conclude that the Indiana Supreme Court's decision that Ward cannot show prejudice from any deficient performance counsel may have rendered was a reasonable application of clearly established law from the U.S. Supreme Court. His claim under *Strickland* must therefore fail. We therefore AFFIRM the judgment of the district court denying Ward's petition under 28 U.S.C. § 2254.