In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1610

JAMES L. LUMPKIN,

*Petitioner-Appellant,*

*v.*

TROY HERMANS,[1] Superintendent,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 19-cv-01008 — **James D. Peterson**, *Chief Judge.*

ARGUED DECEMBER 2, 2021 — DECIDED MAY 2, 2022

Before FLAUM, EASTERBROOK, and KIRSCH, *Circuit Judges.*

FLAUM, *Circuit Judge.* James Lumpkin was arrested and charged with various drug crimes, including two counts of possession with intent to deliver. In his petition for writ of

---

[1] Lumpkin is presently confined at the Oregon Correctional Facility in Oregon, Wisconsin where Troy Hermans is the superintendent. Pursuant to Fed. R. App. P. 43(c), the caption has been updated to reflect the correct superintendent.

habeas corpus and now on appeal, Lumpkin argues that he is entitled to relief because he was denied effective assistance of counsel at trial and that the state court's conclusion to the contrary was unreasonable. In particular, he argues that the state court's determination that he suffered no prejudice as a result of his trial counsel's deficient performance in cross-examining a key witness was an unreasonable application of *Strickland v. Washington*, 446 U.S. 668 (1984). Without deciding whether trial counsel's performance was constitutionally deficient, we conclude that Lumpkin suffered no prejudice as a result of counsel's performance. Therefore, the Wisconsin Court of Appeals' decision to this effect was reasonable, and we affirm the district court's denial of Lumpkin's petition for writ of habeas corpus.

## I.    Background

### A.  Lumpkin's Arrest and Trial

The events leading to Lumpkin's arrest and eventual conviction began on July 16, 2014, when the Tomah Police Department arrested Stacey Suiter as she attempted to purchase heroin from a police informant. Following her arrest, Suiter eventually told an investigating officer that in addition to attempting to purchase drugs from the informant, she had purchased heroin from someone she knew as "Snoop" earlier that day in Sparta, Wisconsin. She told the detective that she had purchased three "points," or 0.3 grams, of heroin for $50 each. Suiter explained that her friend, Kelly Scott Larkin, had wanted the heroin but did not have a connection to a dealer, so Suiter and Larkin traveled to Sparta to meet up with Suiter's connection, Snoop.

Suiter then brought a detective to Sparta and showed him where she had met with Snoop to complete the transaction. Upon returning to the police station, Suiter identified petitioner, James L. Lumpkin, as Snoop from a photograph lineup but changed her story regarding the amount of heroin she had purchased from him. Instead of three, she stated that she had actually purchased six points of heroin, which, she explained, she and Larkin divided equally. Suiter consented to a search of her residence, where she told police they would find six points of heroin if Larkin had not yet picked up his half.

A detective then began a video-recorded interview with Suiter, starting the questioning by stating, "[T]here's a lot of inconsistencies here that you're leaving out." Suiter responded, "What can I possibly do to get out tonight?" and then shortly thereafter reiterated, "I will do anything to get out tonight…. Did you hear me?" Suiter then explained the deal she had worked out with Larkin: For a total of $200 provided by Larkin, the pair would get six points of heroin from Lumpkin, and Suiter would keep three as her fee for arranging the transaction. Suiter assured the interviewing detective that there would be three points in the motel room where she was staying, as she had not used any heroin since the purchase. She also volunteered that the $300 to $400 of cash in her motel room was her rent money—not proceeds from drug sales.

After a short break, the detective returned to the interview room and told Suiter that officers had only uncovered two points of heroin from her motel room. Suiter expressed some confusion but after a long pause admitted that she had, in fact, used one of the points of heroin earlier that day.

Officers then executed a search warrant on Lumpkin's trailer and, during a pat-down of Lumpkin outside, found in his pants pockets 3.1 grams (equivalent to thirty-one points) of heroin, 2.1 grams of cocaine, 1.6 grams of marijuana, and $1104 in small bills. The heroin was divided into twenty-two knotted plastic bags (one with a full gram and twenty-one with 0.1 grams), the cocaine was divided into four such bags, and the marijuana into two. Lumpkin was charged with five counts: (1) possession with intent to deliver cocaine, (2) possession with intent to deliver heroin, (3) delivery of heroin, (4) possession of cocaine, and (5) possession of THC. Lumpkin pleaded not guilty and proceeded to trial on all five counts.

Five months before she testified at Lumpkin's trial, Suiter pleaded no contest to three crimes. The court entered convictions on two but withheld conviction on the third pursuant to a deferred entry of judgment.

At trial, the state first introduced testimony recounting the physical evidence discovered from Lumpkin's person and trailer at the time of his arrest. One officer present during the search testified that, based on his experience and training, the drugs' packaging was consistent with how drugs are typically packaged for sale on the street. That officer also testified about text messages and call records between Suiter and Lumpkin found on Suiter's phone. On the day that Suiter and Larkin had traveled to Sparta to meet up with Lumpkin, Suiter and Lumpkin had exchanged calls shortly after 11:00 AM. About an hour later, Suiter then texted Lumpkin, "300 so full," to which Lumpkin responded, "Cool." Five minutes later, Suiter texted Lumpkin again, "Almost to Sugarberry," the road on which Lumpkin's trailer was located.

Then Stacey Suiter took the stand. She testified that she had purchased a full gram (equivalent to ten points) of heroin from Lumpkin on the day in question, contradicting her earlier statements to police that she had only purchased three or six points. She explained that the text, "300 so full," which she had sent to Lumpkin, meant that Larkin had given her $300 and that, in exchange for that amount, she wanted to purchase a full gram from Lumpkin. Suiter explained that Larkin kept seven points of heroin from the purchase and Suiter received three, one of which she immediately used.

On cross-examination, Suiter admitted that the police promised her she wouldn't be charged if she let them search her motel room. Lumpkin's attorney then attempted to ask whether there was anyone else present in the motel room at the time of the search, to which Suiter responded, "My two kids." After an objection and sidebar, Lumpkin's attorney withdrew the question. He did, however, get Suiter to admit that she had "turned … a profit" on the purchase she made on behalf of Larkin. Defense counsel's cross-examination of Suiter lasted less than five minutes, including the short sidebar. On re-direct, Suiter described herself as a "runner" for purchasers without connections to a dealer and stated that she worked with two or three dealers at any given time.

Larkin then testified that he had driven Suiter to Sparta on July 16, 2014, so that the two of them could purchase heroin. He testified that he did not know Lumpkin and denied that he drove Suiter to a trailer park. He could not remember how much heroin they purchased that day, and when asked whether he received seven points, he responded, "I don't think I have ever seen that much." He admitted, however,

that he was taking "[p]robably two or three" doses of heroin a day at that time, which affected his memory.

A friend of Lumpkin, Jamie West, then testified that she had been around Lumpkin frequently (more than 100 times) in the year before his arrest. She stated that she was aware that he frequently carried large amounts of cash, though she was not aware of his having a job during the time she knew him.

Finally, a detective testified about recorded phone calls Lumpkin had made from jail after his arrest. In one such call, Lumpkin and a male on the other end of the line speculated that it must have been Suiter that had set him up, because she had come to see him the day he was arrested. In another call, Lumpkin described the amount of drugs he had been caught with, saying, "I ain't had shit." The male on the other end responded, "That was still too much though to get caught in your pocket."

Lumpkin elected not to testify, and the defense called no witnesses. In his closing argument, Lumpkin's attorney attacked Suiter's credibility, saying:

> Who's the biggest witness, the star of the show? Stacey Suiter. She is the one who says she bought…. I can tell you this much. The term for a person who takes money and delivers drugs in exchange for that money is a dealer. Straight out. It can't be denied. It can't be argued. She took [Larkin's] money. She came back with the goods. And to say that she is a user, but it is okay. I just kept some of it, that's my reward.

> She is a dealer. That's how she gets her drugs.
> You give me money, I show up with the goods.
>
> What I am not sure of is why she was going to
> see Mr. Lumpkin? Based on the facts, it is just as
> probable she went there to make a sale as she
> went there to make a buy. And finally, as far as
> my opinion of Ms. Suiter, she is storing drugs in
> her residence, which was a motel room, while
> her kids were there. I have very little faith in an-
> ything Stacey Suiter says. She clearly would be
> self-serving, she clearly would say anything she
> believes other people want to hear so she can cut
> a better deal herself.

The jury convicted Lumpkin on four of the five counts, finding him not guilty only on the possession of cocaine count.

### B. Appeals

In June 2016, Lumpkin filed a motion for postconviction relief, arguing that he had received ineffective assistance of counsel at trial. In particular, he asserted that his trial counsel was deficient for failing to impeach Suiter with her inconsistent statements, statements evincing a motive to lie, alleged drug dealing, and prior criminal convictions/deferred judgment. At the evidentiary hearing on this motion, Lumpkin's trial counsel, Adrian Longacre, testified in defense of his cross-examination strategy. Describing his general approach, he stated, "I wanted to let the jury see that she was a user, not the world's most reliable person." He explained that he "didn't want to push too much beyond that" because he did not want to "make [Suiter] look like a victim." When asked

why he didn't impeach Suiter with her inconsistent statements, Longacre explained that he did not see much value in doing so, given that the inconsistencies related only to the amount she had purchased from Lumpkin. Heading down this line of questioning, he explained, might open the door for Suiter to explain that she confused the transaction of the day in question with other transactions she had with Lumpkin in the past. He gave a similar explanation when asked why he did not question Suiter about her motive to lie to the police. And in response to why he did not bring up Suiter's own convictions and her deferred judgment, Longacre simply explained that he did not see any benefit in doing so.

The trial court denied Lumpkin's motion for postconviction relief. Although it found that there had been "at least some deficient performance" by Lumpkin's trial counsel—referring to the decision not to raise Suiter's convictions and deferred judgment as well as the general approach of not wanting to "go too hard on" Suiter—the court determined that Lumpkin had not been prejudiced by the deficient performance. In support of this conclusion, the court pointed to the overwhelming physical evidence of drugs and cash found on Lumpkin as well as the text messages exchanged between Suiter and Lumpkin. According to the court, given this evidence, there was no reasonable possibility that the jury would have issued a not guilty verdict even if the evidence attacking Suiter's credibility had been presented. For this reason, the court denied Lumpkin's motion.

Lumpkin appealed this decision to the Wisconsin Court of Appeals, which affirmed in part and reversed in part the trial court's decision. The court agreed that Longacre's decision not to raise Suiter's statements evincing a willingness to lie to

police ("What can I possibly do to get out tonight?" and "I will do anything to get out tonight.") constituted deficient performance. Additionally, the court agreed that Longacre's failure to present evidence of Suiter's convictions and deferred judgment constituted deficient performance. On the other hand, the court stated that the decision to raise Suiter's inconsistent statements to police was "not objectively unreasonable," since "[t]rial counsel could reasonably believe that attempting to delve into these areas would be time consuming and difficult to explain, and could run the risk of bringing out additional information that would not be favorable to Lumpkin, such as testimony by the informant about previous transactions with Lumpkin."

The appeals court determined that Longacre's deficiencies were prejudicial with regard to the delivery of heroin conviction. That conviction, the court reasoned, depended almost entirely on Suiter's testimony. The failure to effectively impeach her was therefore a critical error and may have changed the ultimate outcome on that count. As to the possession with intent to deliver counts, the court determined that Lumpkin suffered no prejudice from his trial counsel's deficiencies. The court's opinion stated:

> We conclude that there is no prejudice on these counts. Even if the jury were to disbelieve the informant's testimony entirely, we are sufficiently confident that the jury would still have convicted on these counts. Although it is true that certain common physical indicia of intent to deliver were not found in this case, an inference of that intent could still reasonably be drawn from the way the substances were

packaged and the significant amount of cash Lumpkin was carrying.

When Lumpkin filed a petition for review with the Wisconsin Supreme Court alleging that the Court of Appeals had applied the wrong standard under *Strickland*, the appeals court withdrew its opinion and reissued another one, changing only the underlined portion of the following passage:

> We conclude that there is no prejudice on these counts. Even if the jury were to disbelieve the informant's testimony entirely, we are sufficiently confident that the jury would still have convicted on these counts. Although it is true that certain common physical indicia of intent to deliver were not found in this case, <u>we conclude that the jury would most likely still have inferred that intent</u> from the way the substances were packaged and the significant amount of cash Lumpkin was carrying.

The day after this decision issued, Lumpkin filed a motion for reconsideration, alleging once again that the court had applied an improper standard. And again, the court withdrew its opinion. About a month later, the court issued another opinion, this time with only the following underlined changes:

> We conclude that there is no prejudice on these counts. Even if the jury were to disbelieve the informant's testimony entirely, we are sufficiently confident that the jury would still have convicted on these counts. Although it is true that certain common physical indicia of intent

> to deliver were not found in this case, we con-
> clude <u>that it is highly likely that the jury would</u>
> still have inferred that from the way the sub-
> stances were packaged and the significant
> amount of cash Lumpkin was carrying. <u>Accord-</u>
> <u>ingly, there is no reasonable probability that the</u>
> <u>jury would have had a reasonable doubt as to</u>
> <u>Lumpkin's guilt.</u>

Lumpkin filed a second petition for review at the Wiscon-
sin Supreme Court, but the court denied this petition in De-
cember 2018.

Lumpkin then filed a petition for writ of habeas corpus in
the Western District of Wisconsin, raising the same argu-
ments for ineffective assistance of counsel and requesting a
vacatur of his convictions for possession with intent to deliver
heroin and cocaine.[2] The district court denied the petition,
stating that the state appeals court's decision was not an un-
reasonable application of *Strickland*, but issued a certificate of
appealability. This appeal followed.

## II.    Discussion

### A.  Standard of Review and Applicable Law

"On appeal we review de novo district court rulings on
petitions for habeas relief and review any findings of fact for

---

[2] Lumpkin's conviction for delivery of heroin had already been va-
cated by the state appeals court, and he had already completed his sen-
tence for the possession of THC conviction. As such, only his convictions
for possession with intent to deliver heroin and possession with intent to
deliver cocaine were at issue at the district court. These same convictions
remain the only ones at issue now.

clear error." *Brown v. Brown*, 847 F.3d 502, 506 (7th Cir. 2017). "Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court is not authorized to issue a writ of habeas corpus on a claim rejected by a state court on the merits unless the state-court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or was 'based on an unreasonable determination of the facts.'" *Cook v. Foster*, 948 F.3d 896, 901 (7th Cir. 2020) (quoting 28 U.S.C. § 2254(d)).

The applicable federal law in this instance is the Supreme Court's 1984 decision, *Strickland v. Washington*, 466 U.S. 668. In that case, the Court laid out the standard for obtaining relief for ineffective assistance of counsel. The Court ruled that a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance was so serious that it deprived the defendant of a fair trial. *Id.* at 687. With regard to the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential.… Because of the difficulties inherent in making the evaluation [of counsel's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. With regard to the prejudice prong, the defendant must show that there is a reasonable probability that a more favorable result would have occurred absent counsel's errors. *Id.* at 696. The effect of the alleged errors must be of a magnitude that calls into question the reliability of the trial: "In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our

system counts on to produce just results." *Id.* The Court further instructed:

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

*Id.* at 697.

This is true even when a federal court is reviewing the final decision of a state court. *See Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (noting that "[f]ederal courts may not disturb the judgments of state courts unless *each* ground supporting the state court decision is examined and found to be unreasonable." (citation and internal quotation marks omitted)). If the state court's decision that a defendant "suffered no prejudice … was reasonable," then "[t]his is enough to require us to affirm the district court's judgment denying the petition for a writ of habeas corpus." *Ward v. Neal*, 835 F.3d 698, 700 (7th Cir. 2016).

### B. Analysis

Because counsel's performance has been adequately as-
sessed by the state courts in Wisconsin and the district court
below and because a lack of prejudice is decisive, we heed the
Supreme Court's instruction to "dispose of [Lumpkin's] inef-
fectiveness claim on the ground of lack of sufficient preju-
dice," *Strickland*, 466 U.S. at 697, without reviewing the Wis-
consin appellate court's analysis concerning Lumpkin's coun-
sel's performance. Even assuming arguendo that his counsel
performed deficiently, our examination of the record reveals
that Lumpkin suffered no prejudice as a result (with respect
to the possession with intent to deliver counts), and we thus
hold that the Wisconsin Court of Appeals' decision to this ef-
fect was a reasonable application of *Strickland*.

In arguing for reversal, Lumpkin first claims that the Wis-
consin Court of Appeals employed a prejudice standard that
was contrary to that handed down by the Court in *Strickland*.
Repeatedly, Lumpkin points out that the appeals court wrote,
"we conclude that it is highly likely that the jury would still
have" convicted him even but for counsel's errors, which does
not answer the relevant inquiry from *Strickland*, *see* 466 U.S. at
694. He conveniently ignores, however, the very next sen-
tence in the court's opinion: "[T]here is no reasonable proba-
bility that the jury would have had a reasonable doubt as to
Lumpkin's guilt." This holding echoes *Strickland*'s standard
for prejudice almost exactly. *See Strickland*, 466 U.S. at 694
("The defendant must show that there is a reasonable proba-
bility that, but for counsel's unprofessional errors, the result
of the proceeding would have been different."). It matters not
that this language appeared only in the third opinion issued
by the court, for we review the last reasoned state court

decision on the issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804–05 (1991). We therefore reject Lumpkin's argument that the Wisconsin Court of Appeals applied an incorrect standard in evaluating whether he suffered any prejudice.

Having concluded that the court applied the correct prejudice standard, we must now determine whether the state court's determination that Lumpkin suffered no prejudice under that standard was reasonable. The record shows that this conclusion was indeed reasonable. Even if Lumpkin's trial counsel had impeached Suiter so thoroughly that she could be deemed completely unreliable and her testimony could be set aside entirely, there existed overwhelming other evidence incriminating Lumpkin on the possession with intent to deliver counts.

At the time of his arrest, officers uncovered from Lumpkin's pockets three different types of drugs, separated into nearly thirty individual plastic bags. It strains credulity to imagine that Lumpkin was storing this amount of drugs in this manner for personal use. At trial, an officer so testified, stating that this type of packaging was consistent with street sale. Furthermore, in a recorded call from jail, Lumpkin described the amount of drugs he had on him at the time of his arrest—an amount that far surpasses the one to three tenths of a gram Suiter and Larkin testified was the typical amount of heroin purchased at one time for personal use—as being inconsequential ("I ain't had shit."). Also on his person at the time of his arrest was more than $1100 in cash, all in small bills, which, an officer testified, is another fact suggesting that Lumpkin was in the business of dealing drugs. Larkin also testified that he drove Suiter to Sparta, where Lumpkin lived, so the pair could purchase drugs. Text messages uncovered

from Suiter's phone confirm that she and Larkin had planned on purchasing the drugs from Lumpkin and that Suiter had communicated with Lumpkin to confirm those plans. All of this amounts to overwhelming evidence proving that Lumpkin possessed drugs with an intent to deliver them.

Thus, even if the jury had completely set aside Suiter's testimony as a result of a devastating cross-examination by Lumpkin's defense counsel, there is no reasonable probability that the jury would have acquitted him on the possession with intent to deliver charges. Accordingly, we conclude that the state court's decision to this effect was reasonable, apart from his counsel's performance. Even if his counsel's performance was deficient—an issue we do not reach—Lumpkin suffered no resulting prejudice. We therefore deny Lumpkin's petition for a writ of habeas corpus.

### III.    Conclusion

The district court's order is AFFIRMED.